Rashaad MARRIA, Plaintiff,

v.

Dr. Raymond BROADDUS, Deputy Commissioner of Programs; G. Blaetz, Chairperson of Green Haven Correctional Facility Media Review Committee; Warith Deen Umar, Coordinator for Islamic Affairs; and Glen Goord, Commissioner of the New York State Department of Corrections, Defendants.

No. 97 CIV. 8297(NRB).

United States District Court, S.D. New York.

March 27, 2002.

**282**

Rashaad Marria, Wallkill, NY, pro se.

Amy I. Kroe, Sullivan & Cromwell, Laurent Sacharoff, Elise S. Zealand, New York City, for Rashaad Marria.

Stephanie Vullo, Dennis C. Vacco, Attorney General of the State of New York, Alan R. Kusinitz, Eliot Spitzer, Attorney General of the State of New York, for Dr. Raymond Broaddus, G. Blaetz, Warith Deen Umar and Glenn Goord.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiff, Rashaad Marria ("plaintiff" or "Marria"), has been an inmate in the custody of the New York State Department of Correctional Services ("DOCS") since June 1995. For the duration of his incarceration, plaintiff has been a member of the Nation of Gods and Earths ("Nation"), also referred to as the Five Percenters, the Five Percent, and the Five Percent Nation. Defendants are DOCS employees sued in their individual and official capacities: Defendant Glenn S. Goord ("Goord") is the Commissioner of DOCS; defendant Dr. Raymond Broaddus ("Broaddus") was the Deputy Commissioner for Programs Services of DOCS at all times relevant to this action; defendant G. Blaetz ("Blaetz") is a Senior Counselor and the Media Review Committee Chairperson at DOCS'

Green Haven Correctional Facility ("Green Haven"); and defendant Warith Deen Umar ("Umar") was the Coordinator for Islamic Affairs at DOCS at all times relevant to this action (collectively, "defendants" or "DOCS"). Marria challenges DOCS' policy disallowing his receipt of Nation literature, including the newspaper *The Five Percenter*, and denying his request that he be allowed to assemble with other members of this group. He brings this action for declaratory and injunctive relief as well as monetary damages pursuant to 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), the New York State Constitution, and state law. Defendants have moved for summary judgment on all claims and for the exclusion of the testimony and report of plaintiff's expert, Toni Bair ("Bair Report"). Plaintiff moves to exclude the report of defendants' expert, George Camp ("Camp Report").

For the reasons stated below, defendants' motion for summary judgment is denied on plaintiff's First Amendment and RLUIPA claims, and plaintiff's due process claim is dismissed on grounds of qualified immunity. Further, defendants' motion to exclude the Bair Report is denied, and plaintiff's motion to exclude the Camp Report is granted.

## BACKGROUND[1]

In August of 1994, while incarcerated at Rikers Island, plaintiff became a member of the Nation of Gods and Earths ("the Nation"), or the Five Percenters as they are commonly called.[2] *See* Marria Decl.

---

1. Unless specifically noted, all facts stated herein are drawn from plaintiff's complaint and the parties' submissions in connection with the present motion. The latter include their Local Rule 56.1 Statements ("56.1

Stmt."), deposition transcripts, affidavits or declarations, and other exhibits attached thereto.

2. "Five Percent" derives from the belief of Nation members that they should teach the

¶ 5; Pl.'s 56.1 Stmt. ¶ 1. As plaintiff describes the Nation, it is "a group of individuals who share a common way of life and culture predicated on a belief in God." *See* Marria Decl. ¶ 7. The Nation was founded more than thirty years ago by Clarence 13X Smith, who left the Nation of Islam ("NOI")[3] and, with the assistance of the City of New York and the Urban League, began the Allah Youth Center in Mecca of Harlem, New York ("Allah Youth Center"). *See* Blocker Decl. ¶ 7; Zealand Decl. Ex. M (history of Nation); Ex. N (article about Nation). The doctrine of Nation members is based upon the teachings of the Koran and the Bible, as well as the 120 Degrees, the Supreme Alphabet, and the Supreme Mathematics[4]. *See* Marria Decl. ¶¶ 13–14. Plaintiff asserts that to engage in violent or disruptive activities within the DOCS system goes against the teachings of the Nation, which focus largely on education, self-improvement, self-worth, and responsibility. *See* Pl.'s 56.1 Stmt. ¶¶ 2–3. Plaintiff has submitted the declarations of numerous Nation members, living both within and outside the DOCS system, asserting that the Nation is not a gang and does not promote violence. *See* Barnes Decl., Williams Decl. (asserting that Five Percenters are not a gang and do not engage in gang like activities); Jones Decl. (same); Buford Decl. (same); Clausen Decl. (same); Khalifah

---

Nation's lessons to others. As described by plaintiff, the 5% are the poor righteous teachers of freedom, justice, and equality who do not believe in the teachings of the 10%. The 85% percent believe the teachings of the 10% that a mystery God exists, and the 10% keep the 85% enslaved by having them worship a God they cannot see. *See* Marria Decl. ¶ 19. It is significant to note that while Nation members subscribe to this belief, and "Nation of Gods and Earths" is often used interchangeably with "Five Percenters," others such as the Nation of Islam also believe in this categorization and may therefore also be referred to as "Five Percenters."

**3.** According to plaintiff, while the Nation shares some tenets with the NOI, including the beliefs that the white man is the devil and that the white man was made through a selective breeding process called grafting, there are marked differences in the teachings of the NOI and the Nation. *See* Marria Decl. ¶¶ 11–12. The most significant difference between the NOI and the Nation is that the NOI teaches that Allah appeared in the person of Master Fard Muhammed, whereas the Nation teaches that every black man is God with the proper name of Allah. The Nation also does not participate in Ramadan, Jumma, and some other traditional Islamic customs.

While the NOI and the Nation differ in their interpretation of the 120 Degrees, referred to as the Book of Supreme Wisdom by the NOI, both groups study the lessons contained inside. *See* Blocker Decl. ¶¶ 8–11. DOCS permits the Book of Supreme Wisdom to be issued to any inmate who is a registered member of NOI, but Nation members who have not registered as members of the NOI are not permitted to view these materials. *See* Blocker Decl. ¶¶ 10–11.

**4.** Just as Nation members are required to fast on holy days and follow dietary restrictions such as not eating pork, they are also required to study the lessons in these teachings both individually and in group sessions. The 120 Degrees are lessons arranged in a question and answer format that represent the teachings of Master Fard Muhammad and Elijah Muhammad. *See* Marria Decl. ¶ 14. The Supreme Alphabet and Supreme Mathematics are numerology devices used "to understand man's relationship to the universe and Islam." *See* Marria Decl. ¶ 13 & Ex. B; Kahlifah Decl. ¶ 7. For example, the letter "A" stands for "Allah" and is defined as "the proper name of the original blackman who is God; Arm–Leg–Leg–Arm–Head." *See* Marria Decl. Ex. B (describing Supreme Alphabet). As another example, the number "1" represents "Knowledge," and is defined as follows:

1. Knowledge—is to know, look, observe and respect. Knowledge is the foundation of all things in existence just as the blackman is the foundation of his family and all civilization in existence. Thus making knowledge symbolic to the blackman.

*See* Marria Decl. Ex. B (describing the Supreme Mathematics).

Decl. (same); Pittman Decl. (asserting that the Nation is not a gang and that he has never been retaliated against in prison for ending his association with the Nation); and Lake Aff. (same).

Not surprisingly, DOCS' characterization of the Five Percenters[5] is drastically different from plaintiff's. "DOCS deems incarcerated Five Percenters an organized threat to the safety, order and security of their prison facilities." Defs.' 56.1 Stmt. ¶ 10. In support of its classification of the Five Percenters as a security threat group, DOCS has submitted such evidence as affidavits from DOCS personnel, internal memoranda and notes by DOCS personnel and inmates discussing Five Percenters, unusual incident and separatee reports noting the involvement of Five Percenters, and information characterizing Five Percenters as a gang from other corrections departments such as the New York City and New Jersey departments of corrections. *See* Artus Decl. Ex. F, H, J, K, M, N, and O; Zimpfer Decl.; Dubray Decl. DOCS has also submitted affidavits from former Five Percenters, who describe the group as a hierarchical gang headed by elders, the members of which extort and steal from other inmates and carry out violent acts using codes derived from the Supreme Alphabet and Mathematics. *See* S___ Decl.; H___ Decl.

DOCS' justification for their ban on literature and assembly of Five Percenters stems from their internal policy adopting a non-recognition strategy for security threat group management. DOCS' position is that the Five Percenters are a gang and a threat to the internal management of DOCS' prisons. The non-recognition strategy is designed to diminish the power of the Five Percenters by refusing to legitimize their existence. *See* Defs.' Mot. at 2–9. DOCS argues that allowing Five Percenters to assemble and receive group literature would legitimize the status of the Five Percenters and interfere with DOCS' management of a security threat group. *See id.*

One piece of literature specifically at issue in this case is *The Five Percenter*, a newspaper published each month by the Allah Youth Center. It contains articles about current events relevant to the Nation, information about community activities, letters to the editor, editorials, and Five Percenter lessons, including teachings from the 120 Degrees, the Supreme Alphabet, and the Supreme Mathematics. Plaintiff asserts that members of the Nation are required to study these lessons on a daily basis in order to understand how to lead a righteous life. *See* Marria Decl. ¶ 13.

On March 27, 1996, while incarcerated at Green Haven, plaintiff received a notice informing him that a March 1996 issue of *The Five Percenter* addressed to him had arrived at the facility and was being held by the Media Review Committee. *See* Am. Compl. ¶ 16; Marria Decl. Ex. M. This notice further informed him of his option to promptly submit to Blaetz, Media

---

5. Defendants' submissions refer largely to "Five Percenters" and seem not to distinguish between Five Percenters and the Nation of Gods and Earths. It is not entirely clear from the terminology used in the parties' submissions that DOCS and plaintiff use these terms with the same meaning and to identify the same members. As previously noted, the term "Five Percenter," while commonly used to describe Nation members, can be used more generally to describe a person who subscribes to the belief that all people can be broken down into the five percent, the ten percent, and the eighty-five percent. *See supra* n. 2. Therefore, though the term "Five Percenter" is commonly used to describe Nation members, not every Five Percenter is actually a member of the Nation of Gods and Earths. *See* Tr. of Oral Argt. at 28–29.

Review Committee Chairperson, a written statement in support of the admission of the publication, adding that a decision must usually be reached by the Media Review Committee within ten working days. *See id.* Plaintiff responded, and was subsequently sent a letter by the Media Review Committee stating that *The Five Percenter* newspaper had been sent to the Coordinator for Islamic Affairs. This letter did not contain the address or contact information for Umar, who was the Coordinator for Islamic Affairs at that time. *See* Marria Decl. ¶ 33, Ex. N, P.

When the same series of events occurred in April concerning the receipt of the April 1996 edition of *The Five Percenter*, plaintiff wrote to Acting Commissioner Coombe complaining about these events, and requesting an explanation as well as contact information for the Coordinator for Islamic Affairs. This letter was referred to Broaddus, Deputy Commissioner of Program Services, who informed plaintiff in a letter of June 7, 1996, that the ten day time limit imposed by DOCS Directive # 4572 [6] for review of a publication is inap-

plicable in those cases where under *Muhammed v. Coughlin*,[7] the Coordinator for Islamic Affairs reviews all publications having to do with the Five Percenters. *See* Marria Decl. Ex. P (letter of June 7, 1996), Ex. Q (Directive # 4572). Broaddus further suggested that Marria contact the Chairperson of the Media Review Committee at Green Haven to obtain the address for the Coordinator for Islamic Affairs. *See id.*

Plaintiff received Broaddus's letter after his June 1996 transfer to Elmira Correctional Facility ("Elmira"). He inquired as to the contact information for the Coordinator for Islamic Affairs, and sent Umar a letter concerning the status of his newspapers. *See* Pl.'s 56.1 Stmt ¶¶ 22–24. Umar did not respond to this letter, and Marria has never been informed of what happened to his March and April 1996 editions of *The Five Percenter* or given an option to determine what should happen to them. *See* Pl.'s 56.1 Stmt. ¶ 25. While at Elmira, plaintiff again began receiving his subscription to *The Five Percenter*, though

6. Directive # 4572, titled "Media Review," instructs that newspapers may only be received from the publisher or an approved distributor subject to Media Review guidelines. Further, it states that in the event that the Media Review Committee fails to respond to an inmate within 10 working days, the inmate has a right to appeal the lack of decision in writing to the Central Office Media Review Committee. *See* Marria Decl. Ex. Q. Should the Media Review Committee disapprove a publication, the inmate is to be notified in a Disposition Notice and told the precise reason why the publication violates the media review guidelines, including the page number, article title, and location on the page of the article objected to. *See id.* When an article is disapproved, the inmate has four options: (1) he may appeal to the Central Office Media Review Committee within 30 days; (2) in certain cases, he may receive the publication with the objectionable material removed; (3) he may have the publication sent at his own expense to another person outside the facility, either

immediately or after 30 days; and (4) he may have the publication destroyed after 30 days. If the inmate does not make a choice among these options, the facility may dispose of the publication in any manner. *Id.*

7. As a result of a settlement in *Muhammed v. Coughlin*, DOCS recognizes NOI as a religion and allows inmates to receive NOI literature. *See* Broaddus Decl. ¶¶ 5–6. As defendants now explain, plaintiff's copies of *The Five Percenter* were forwarded to the Media Review Committee because confusion arose as to whether the newspaper was authorized under *Muhammed v. Coughlin* as NOI literature, or contraband due to the Five Percenters' status as a security threat group. *See id.;* Blaetz Decl. ¶¶ 5–11. The forwarding of these materials to the Media Review Committee was an error because, according to defendants, literature defined as contraband does not fall under the jurisdiction of the Media Review Committee. *See* Blaetz Decl. ¶¶ 9–11.

the June 1996 issue was withheld.[8] In September 1997, plaintiff was transferred to Shawangunk Correctional Facility ("Shawangunk"). On September 22, 1998, Marria wrote a letter to Umar requesting a copy of any directives, memos, rules, or regulations DOCS follows in the handling of Five Percenter literature. In a letter dated October 19, 1998, Umar responded as follows:

> Dear brother:
>
> This responds to your letter of September 22, 1998. There are no directives or rules and regulations regarding Five Percenters. The reason for this is because the courts have ruled that Five Percenters are not a legitimate religious group. The New York State Department of Correctional Services does not acknowledge the claims of inmates who designate themselves as Five Percenters. You may want to explore some of the teaching of the Muslims and the Nation of Islam in your facility.
>
> Your brother in Islam,
> Imam Warith Deen Umar
> Ministerial Program Coordinator
> Ministerial and Family Services

This letter appears to represent the last contact between plaintiff and DOCS' with respect to *The Five Percenter.*

The parties later stipulated that defendants' policy is to deny plaintiff access to *The Five Percenter* at any DOCS facility. *See* Am. Compl. Ex. A., Stipulation dated December 17, 1999. Furthermore, on December 20, 2000, Marria made a formal request that staff and space be provided for gatherings called civilization classes, Parliaments, and the observation of Holy Days for Five Percenters. *See* Marria Decl. ¶ 28 and Ex. J. This request was denied. *See id.*

Plaintiff has asserted five causes of action in his amended complaint based on defendants' policy of denying him access to *The Five Percenter* and other literature, and the opportunity to congregate. First, Marria asserts that defendants' policy violates his right to free exercise of religion and of assembly as guaranteed by the First and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983. Plaintiff's second cause of action states a violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc, on the same factual grounds. Third, plaintiff alleges a violation of his right to free expression as guaranteed by the First and Fourteenth Amendments to the Constitution pursuant to 42 U.S.C. § 1983. Fourth, Marria asserts that defendants' acts have deprived him of his property without due process in violation of the Fourteenth Amendment to the Constitution, pursuant to 42 U.S.C. § 1983. Finally, plaintiff claims a violation of his right to free exercise of religion as provided for by Article I, Section 3 of the New York State Constitution and New York Correction Law Section 610.

---

**8.** Unlike the April and June issues, the Media Review Committee at Elmira did determine and inform plaintiff that the June 1996 issue was inconsistent with media review guidelines. Plaintiff appealed the decision to the Central Office Media Review Committee ("COMRC"). He received no response to his appeal, and on August 14, 1996, wrote a letter to Elmira Superintendent Floyd Bennett ("Bennett") requesting investigation into the failure of the COMRC to respond to his appeal concerning the June issue. *See* Marria Decl. Ex. T. On August 16, 1996, Elmira Captain D.G. Aiedala ("Aiedala") responded on behalf of Bennett, informing Marria that Elmira had complied fully with DOCS Directive # 4572, and that he should write to Media Review in Albany to request information on the status of his appeal. *See* Marria Decl. Ex. U. On August 23, 1996, Marria sent such an inquiry to the COMRC. *See* Marria Decl. Ex. V.

## I. Admissibility of Expert Reports

As a threshold matter, we first determine the admissibility of the reports of plaintiff's expert Toni V. Bair ("Bair") and defendants' expert George M. Camp ("Camp"). Because the purpose of summary judgment is to "weed out" cases in which there is no issue of material fact and where the moving party is entitled to judgment as a matter of law, it is appropriate to decide the admissibility of evidence, including expert reports, at the summary judgment stage. *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997).

The admissibility of expert evidence is governed by Rule 702 of the Federal Rules of Evidence. This rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court mandated that the trial judge perform a "gatekeeping" function in assessing the admissibility of expert evidence under Rule 702. Such a task involves ensuring that the expert evidence is both relevant and reliable.[9] In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court applied the *Daubert* analysis to expert testimony by non-scientists, such as the testimony offered in this case.

### A. Defendants' Motion to Exclude the Bair Report

■ By way of background, a brief description of the Bair Report is in order. In short, the Bair Report concludes that the presence of *The Five Percenter* in a prison facility does not threaten the order of that prison system. *See* Zealand Decl. Ex. E. More specifically, the report finds that the production of *The Five Percenter* is unconnected with inmate populations, and that the publication is innocuous on its face. Further, Bair concludes that the Supreme Alphabet and Mathematics, which are widely available for anyone to view, could not effectively be used by inmates as a code. The report also concludes that the Five Percenter belief that white man is the Devil is not new to prison group populations, and does not pose a security threat.

Defendants object to the Bair Report on the grounds that (1) Bair is not qualified as an expert on the matters in the report, (2) his conclusions are not reliable, and (3) the opinions expressed in the report are irrelevant to the issues in the case. First, we reject out of hand defendants' contention that Bair is not qualified to serve as an expert in this case. Given Bair's significant experience in corrections management[10], defendants' position that Bair is

---

**9.** Factors that may be considered in determining the reliability of an expert's reasoning include whether the expert's theory can be tested, whether there has been peer review or publication, the existence of known or potential error rates and standards governing the technique's operation, and whether there has been general acceptance of the methodology in the scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786.

**10.** Bair has been a corrections professional for more than twenty years, and his past positions have included serving as the warden of prisons in both Virginia and Utah. *See* Zealand Decl. Ex. E (including curriculum

unqualified to serve as an expert on the issue of whether *The Five Percenter* poses a management threat is unsupportable.

Defendants' second argument is that Bair arrived at the conclusions in his expert report without the benefit of a reliable methodology. The thrust of defendants' argument is that Bair is not knowledgeable in security threat group management in DOCS system, did not survey other prison systems, and did not consult literature on prison gang management in making his assessment.[11] We find this argument unpersuasive. In *Kumho Tire*, the Supreme Court stated, "[n]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." 526 U.S. at 156, 119 S.Ct. 1167. As plaintiff argues, Bair is an expert in correctional management with over twenty years experience and he is qualified to testify as to why, as a warden, he would not have banned *The Five Percenter* newspaper based on its content. *See* Pl.'s Mem. in Opp'n at 17.

Finally, defendants also argue that Bair's testimony is irrelevant because the constitutionality of defendants' decision to ban Five Percenter literature rests on an analysis of DOCS' justification for this management decision. They argue that because Bair has no training in security threat group management, his testimony is both irrelevant and unhelpful to the finder of fact. In essence, defendants assert that because it is the presence of the literature rather than its content that are at issue in this case, Bair's analysis of the literature is irrelevant.

It is true that defendants' position in this case appears to be that it is not the content of *The Five Percenter* but rather its presence as a symbol of an unauthorized group that represents a danger to prison management. *See* Tr. of Oral Argt. at 37. However, simply because defendants have framed their defense in such a way does not render irrelevant plaintiff's position that the content of the materials themselves do not pose a threat to security. Because the issues of whether the publication supports, recruits, or encourages gang affiliation, enables inmates to communicate by code, or threatens the order of the prison through a message of black superiority are relevant issues in this case, the Bair report is relevant.

For these reasons, we find the Bair Report admissible and deny defendants' motion to exclude the report from consideration on summary judgment or at trial.

## B. Plaintiff's Motion to Exclude the Camp Report [12]

■ Defendants' expert George Camp has approximately forty years of experience in criminal justice consulting and corrections management, including holding positions at numerous prisons and publishing several articles on violence in prisons and gang management. The opinions in the Camp Report incorporate conclusions

---

vitae). Further, Bair has a Ph.D. in Sociology with a concentration in Criminal Justice, and has taught college courses on prison related issues for almost ten years, including courses on criminal justice management and prison issues and dilemmas. *See id.*

11. As the basis for his report, Bair consulted the complaint, the answer, nine editions of *The Five Percenter*, a number of Internet websites on the Five Percenters, DOCS Directives

# 4572, DOCS Rule 105.12, depositions of several DOCS employees, and various Five Percenter literature. *See* Zealand Decl. Ex. E.

12. Two almost identical reports prepared by Camp have been submitted by the parties, one dated March 13, 2000 (hereinafter cited as "Camp report (1)"), and the other March 24, 2000 (hereinafter cited as "Camp report (2)"). *See* Zealand Decl. Ex. C and D.

drawn from three separate sets of data as well as the experience of the author. First, Camp analyzed the data produced to plaintiff by DOCS counting the number of unusual incident reports [13] that expressly noted the involvement of a Five Percenter as well as those incidents that expressly involved members of five other groups.[14] Second, Camp performed the same analysis on separatee reports [15] produced for the same time period. Third, Camp conducted his own survey ("the Camp Survey"), sending a questionnaire by electronic mail to members of the Association of State Correctional Administrators, an organization of prison commissioners and directors. This questionnaire asked these administrators about the presence of Five Percenters in their systems and about their policies with respect to management of the group and dissemination of literature to them. *See* Zealand Decl. Ex. D, Camp Report (2), Attach. A. Because we conclude that the conclusions drawn in the Camp Report are both misleading and based on unreliable methodology, the Camp Report is inadmissible.

### 1. The Camp Survey

Plaintiff's first argument attacking the validity of the Camp report is that the Camp Survey was subjective and biased, and the results therefore do not bear the indicia of trustworthiness required to admit a survey into evidence. We agree with this contention. The trustworthiness of survey evidence depends in part on an assurance of objectivity in the information gathering process, such as whether "the questions asked of interviewees were framed in a clear, precise, and non-leading manner." *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1205 (E.D.N.Y.1983) (excluding a survey in part because one of the interviewers was aware that Toys "R" Us sponsored the survey, creating a possibility of bias); *see also* Shari Seidman Diamond, *Reference Guide on Survey Research, in Reference Manual on Scientific Evidence* 229, 248–264 (2d ed.2000) (discussing survey design).

The questionnaire on which the Camp Survey is based begins as follows:

Dear Members,

We need your help.

We are helping to defend the NYS Department of Correctional Service in a case that involves their policy on intercepting Five–Percenter literature. Your answers to the following questions will be helpful to us in preparing a defense.

Using this introduction, Camp e-mailed this questionnaire to prison administrators. The questionnaire not only makes clear that the information is being gathered to defend DOCS, but it also identifies the specific topic of the lawsuit and DOCS' actual position on the dissemination of Five Percenter literature. Because the biased nature of this survey renders its

---

13. The figure representing the total number of unusual incident reports includes incidents of violence reported to DOCS, but may also include non-violent incidents, such as a staff member causing damage to a state vehicle at a correctional facility for example. *See* Artus Decl. Ex. K, Artus. Decl. in Production ¶ 7.

14. During discovery, defendants produced to plaintiff, using a computer program plaintiff provided, a breakdown of the total number of unusual incident reports and separatee reports for each year from 1990 to 1999, the number and substance of reports mentioning Five Percenters, and the number and substance of reports mentioning five other groups. These groups are the Latin Kings, the Bloods, the Crips, Neta, and the Nation of Islam. *See* Artus Decl. Ex. K. This production was used by Camp in preparing his expert report.

15. Separatee reports recount occasions on which certain inmates had to be separated from each other.

results unreliable, the Camp Survey is inadmissible.

The Camp Survey has several other deficiencies as well. Of the approximately 50 systems about which Camp sought responses from prison administrators, including all the state systems and the federal prison system, he received responses representing 22 systems. While this shortcoming may not be fatal, his report does not account for how his results might be skewed based on the failure of over half of those surveyed to respond. Furthermore, some of the conclusions Camp draws from the data he collected using the survey are suspect. For example, one of the significant findings the Camp Report makes is the percentage of inmates in DOCS' facilities who are Five Percenters. To determine this percentage, Camp asked each respondent to his questionnaire to identify how many Five Percenters are confined in that system's facilities. However, Camp does not ask how they gathered this information. Then, using these questionable survey responses, Camp calculates the percentage of Five Percenters in the New York DOCS to be 1.4 percent of inmates by averaging the percentages of Five Percenters in the prisons of Massachusetts (.5%), Connecticut (1.2%), and New Jersey (2.6%). When asked at his deposition why he chose those three states but not other nearby states, Camp responded,

> Well, I don't recall other than I thought that those three were closer in terms of a correctional system to New York. And New Hampshire is not boarding, Vermont is really an entirely different type of state and I think just from a correc-

tional perspective, those states have more in common with New York.

Therefore, not only does Camp have no idea how respondents to his survey approximated the number of Five Percenters in their own state systems, his representation of the number of Five Percenters in the New York system is based on an average of three states chosen because Camp perceived that their correctional systems have "more in common" with New York.[16] This methodology for determining the number of Five Percenters in New York prisons simply cannot be deemed reliable.

### 2. Statistical Analysis of Unusual Incident and Separatee Reports

Plaintiff also persuasively challenges Camp's statistical analysis of the data generated from the unusual incident reports and separatee reports. For example, one conclusion drawn by Camp in his report and illustrated in Charts 2–D and 3–D is that DOCS' policies with respect to Five Percenters "have had a salutary and significant impact on their prison environments." See Zealand Decl. Ex. D, Camp Report (2) at 5–6. As support, Camp explains that of all unusual incident reports mentioning one of the six analyzed groups, the percentage of unusual incidents involving Five Percenters dropped from 78.6 percent in 1990 to 2.0 percent in 1999. Similarly, with respect to separations, this percentage dropped from 85.4 percent to 3.7 percent. Camp places these percentages on a chart, making much of this dropoff in the percentage of such incidents among Five Percenters. However, as Camp later seems to acknowledge, these numbers actually reflect a rise in unusual

---

**16.** Moreover, neither Camp's responses at his deposition nor the Camp survey demonstrate that Camp performed any kind of census or statistical analysis to support his conclusion of commonality between New York's corrections system and those of New Jersey, Massa-

chusetts, and Connecticut. For example, there is no indication that Camp considered a statistical analysis of the racial compositions of the prison populations in these four states, a factor that would tend to support his perception of commonality.

incidents and separations of the other identified groups, and not an appreciable improvement in the total numbers of such incidents involving Five Percenters.[17]

Furthermore, Camp does not account for the statistical significance of the numbers he has analyzed. As noted by plaintiff, "by shrinking the universe of unusual incident reports to those that include Five Percenters, Latin Kings, Bloods, Netas, Crips, or Nation of Islam...Mr. Camp has artificially inflated instances in which Five Percenters were mentioned in unusual incident reports." *See* Pl.'s Mem. in Opp'n at 15; Zealand Decl. Ex. D, Camp Report (2), Table 2. The number of total incident reports mentioning Five Percenters during the analyzed nine year period ranged from 11 to 2. Unacknowledged by Camp, during those years, the total number of unusual incidents ranged from just over 7,000 to around 12,300. For these reasons, not only are Camp's conclusions baseless, the graphs and charts he created making much of the relative percentages of incidents among the six groups surveyed are misleading and are thoroughly unhelpful to the trier of fact.[18]

In conclusion, because the Camp Report is misleading, unhelpful to the trier of fact, and founded on biased and therefore unreliable evidence, Camp's testimony is inadmissible.

## II. Defendants' Motion for Summary Judgment

### A. Standard for Summary Judgment

Summary judgment is properly granted where the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.'" *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing the record, we are required to assess the evidence "in the light most favorable to the non-movant and ... draw all reasonable inferences in [the non-movant's] favor." *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990). The mere existence, however, of an alleged factual dispute between the parties will not defeat a motion for summary judgment. In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for

---

**17.** For instance, the 78.6 percent of unusual incident reports involving Five Percenters in 1990 as relative to other identified groups reflects the following breakdown: 11 unusual incidents involving Five Percenters, 3 involving the Latin Kings, and none involving the Bloods, Neta, the Crips, and N.O.I. By contrast, the 2.0 percent of such reports involving Five Percenters in 1999 as relative to other identified groups reflects this breakdown: 2 involving Five Percenters, 15 involving Latin Kings, 65 involving the Bloods, 8 involving Neta, 8 involving the Crips, and 3 involving N.O.I. This illustrates that the drop noted by

Camp does not reflect the drop in incidents involving Five Percenters so much as it reflects the increase in the activities of these other groups. *See* Zealand Decl. Ex. D, Camp Report (2), Table 2.

**18.** Plaintiff points out that in 1990, for example, a year in which 11 unusual incident reports mentioned Five Percenters, there were 7,083 total reports. By these numbers, the percentage of reports mentioning Five Percenters is sixteen hundredths of one percent. *See* Pl.'s Mem. in Opp'n at 15.

trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505 (internal quotation omitted).

## B. Sincerity and Religious Nature of Plaintiff's Beliefs

█ As a threshold matter, we discuss DOCS' position that plaintiff may not seek the protections of the First Amendment or RLUIPA because he has failed to demonstrate the sincerity [19] of his professed beliefs. In support of this argument, DOCS notes that Marria stated at his first deposition that the Five Percenters are not a religion, but rather a way of life. *See also* Artus Decl. Ex. Q (issue of *The Five Percenter* with headline and article entitled "We Are Not A Religion"). DOCS argues that Marria's statement at his second deposition that he believes Five Percenters to legally be a religion is merely a self-serving tactic to further this litigation. On this basis, DOCS argues that there is no genuine issue of material fact as to the sincerity of plaintiff's beliefs and that his claims must therefore be dismissed.

The Second Circuit has explained that a court's scrutiny of whether a plaintiff deserves free exercise protection "extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir.1996) (discussing this standard in the context of RFRA). In *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir.1984), a case involving a constitutional challenge brought by a Five Percenter inmate, the Second Circuit addressed the propriety of granting summary judgment for failure to establish that beliefs and practices are religious in nature. In that case, the Court held that summary judgment was inappropriate because "subjective issues of sincerity of belief and the perceived nature of that belief" were questions of fact at issue, requiring the factfinder to "delve into the internal workings of [plaintiff's] mind and assess the credibility of his claims." *Id.* at 158.

Under this case law and given the record before the Court, the sincerity and religious nature of plaintiff's beliefs are clearly material facts in dispute. DOCS' argument is a semantic one, focusing on plaintiff's reluctance to call the Nation of Gods and Earths a "religion"—a reluctance that stems from Nation teachings that religions have historically been used to enslave followers by encouraging them to worship a God they cannot see. *See* Tr. of Oral Argt. at 29–35; Pl.'s Mot. in Opp'n at 23 ("[W]hen plaintiff states 'We are not a religion,' he is not making a concession, but is articulating a central tenet of his belief system—a rejection of the traditional notion of 'religion' that has served to suppress black people and incite violence among sects."). Plaintiff explains that although he would not use the word "religion" to describe the Nation, the Nation

---

**19.** Defendants actually use the words "sincerity" and "legitimacy" interchangeably in making this argument, demonstrating their misunderstanding of the appropriate scope of this Court's inquiry into plaintiff's religious belief. As stated by the Second Circuit:

> It cannot be gainsaid that the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs. Mindful of this profound limitation, our competence properly extends to determining "whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious."

*Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir.1984) (citing *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)).

holds the same significance in his life as Christianity to an observant Christian. *See* Marria Decl. ¶¶ 7–8; Vullo Decl. Ex. G, Marria Depo. at 9–12. Further, as already described in some detail, plaintiff has submitted substantial evidence that he has been a member of the Nation since August of 1994 and that he lives by the Nation's teachings and observes the Nation's holy days to the extent possible under DOCS regulations.[20] For these reasons, we find that material issues of fact exist with respect to the sincerity and religious nature of plaintiff's beliefs.

## B. First Amendment [21]

 The adjudication of constitutional claims arising in the prison setting requires recognition of the value of inmates' constitutional rights as well as deference to the policy-making expertise of prison administrators. As is oft-quoted, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Giano v. Senkowski,* 54 F.3d 1050, 1052 (2d Cir.1995) (citing *Turner*). However, in recognition of the complexities of prison administration and the superior competence of the executive and legislative branches in guiding prison management, the judiciary affords substantial deference to appropriate prison authorities. *Turner,* 482 U.S. at 84–86, 107 S.Ct. 2254; *Giano,* 54 F.3d at 1053.

The proper inquiry in those cases where a prison regulation impinges on an inmate's constitutional rights is whether the regulation is reasonably related to legitimate penological interests. *Turner,* 482 U.S. at 89, 107 S.Ct. 2254 (establishing this standard and applying it to a prison policy prohibiting correspondence among inmates of different institutions); *Thornburgh v. Abbott,* 490 U.S. 401, 404, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (applying this analysis to a prison policy allowing the warden to reject publications sent to inmates in certain circumstances). This "reasonableness" test is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

In *Turner,* the Supreme Court laid out a four factor test to be applied by courts in determining the reasonableness of a prison regulation. First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forth to justify it. *Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254. Since "the governmental objective must be a legitimate and neutral one," it is appropriate to inquire whether the regulation operates in a "neutral fashion, without regard to the content of the expression." *Id.* Second, while remaining mindful of the judicial deference owed to prison officials, a court should inquire as to whether alternative means of exercising the right remain open

**20.** In support of its position that plaintiff has failed to demonstrate the sincerity of his religious beliefs, DOCS makes the wholly untenable argument that "plaintiff has never participated in a parliament, a fundamental ritual, before or after his incarceration, which is similar to a Catholic never going to Mass." Defs.' Reply Mem. at 9. As the record makes clear, however, plaintiff did not become a member of the Nation until after his incarceration began, and DOCS has denied plaintiff's

request to hold Parliaments. *See* Marria Reply Decl. ¶ 6.

**21.** The First Amendment of the United States Constitution provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

to the inmate. *Id.* at 90, 107 S.Ct. 2254. Third, we consider the impact accommodating the asserted constitutional right would have on prison officials, other inmates, and prison resources. *Id.* Finally, mindful that prison officials are not required to show that the regulation is the least restrictive alternative, we consider whether there are ready alternatives that could be substituted for the contested regulation at a *de minimus* cost to penological goals. *Id.* at 91, 107 S.Ct. 2254.

In applying the *Turner* standards to this case, we conclude that it is inappropriate to award summary judgment on plaintiff's First Amendment claims of free exercise and freedom of expression. With respect to the first *Turner* factor, there is no question that prison safety and security are legitimate (as well as compelling) penological interests. *See Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995); *Breland v. Goord,* No. 94 Civ. 3696(HB), 1997 WL 139533 (S.D.N.Y. March 27, 1997). Marria argues that DOCS' ban on Five Percenter literature and assembly is not rationally related to this legitimate interest because DOCS has not established that the Five Percenters have correctly been classified a security threat group.[22] In opposition to defendants' evidence that Five Percenters engage in violence in prison, plaintiff has submitted evidence that as a group, Nation members inside and outside of prisons are committed to righteousness and against violence. Plaintiff has also submitted evidence that the Supreme Alphabet and Supreme Mathematics are not a code, that

Nation membership requires no initiation rights, and that members are free to leave the Nation whenever they wish without reprisal. Plaintiff argues that while evidence like the unusual incident reports submitted by DOCS demonstrates that some Five Percenters have committed violent acts in prison, DOCS' classification of the group as a whole is unjustified.[23] Further, while DOCS asserts that the literature and assembly ban is unrelated to the content of the expression but rather intended to further their non-recognition strategy, plaintiff cites specific evidence in the record that challenges this characterization of DOCS' policy as content neutral. *See* Zealand Decl. Ex. S, Roy Depo. at 134–35 (stating that "to a degree," the reason Five Percenter literature is banned is because of language discussing the white man as a devil).

Two courts in this district have previously determined that summary judgment was inappropriate in Five Percenter cases with similar facts. *Graham v. Cochran,* No. 96 Civ. 6166(JSR)(RLE) (S.D.N.Y. March 30, 2000) (order adopting Report and Recommendation of February 14, 2000); *Breland v. Goord,* No. 94 Civ. 3696(HB), 1997 WL 139533 (S.D.N.Y. March 27, 1997) (denying summary judgment where DOCS' position was that Five Percenter literature may be banned because it incites violence).[24] In *Breland,* the Court evaluating the first prong of the *Turner* analysis focused on whether the defendants had proven a link between the violent incidents cited by DOCS and the content of the banned liter-

---

**22.** DOCS admits that if the Five Percenters were improperly classified as a security threat group, defendants would have no interest in banning Five Percenter literature. *See* Tr. of Oral Argt. at 37–38.

**23.** Plaintiff points out that according to the unusual incident reports collected by DOCS over a nine year period, the most unusual incident reports mentioning Five Percenters

in any given year was 11 reports, constituting sixteen hundredths of one percent of unusual incident reports for that year.

**24.** Although these cases dealt with claims similar to Marria's, both were settled, thus leaving the constitutionality of DOCS' ban unresolved.

ature, and held that DOCS' had not established such a link. In our case, DOCS seeks to circumvent the *Breland* Court's holding that such a link was not readily apparent by arguing that even though the literature itself is innocuous on its face, it is the presence of the literature in DOCS' facilities that encourages gang formation and leads to violent confrontations.

Even given the policy-making deference afforded prison administrators, we cannot say as a matter of law on this record that DOCS' has shown that its absolute ban on the literature and assembly of the Nation of Gods and Earths is rationally related to the legitimate purpose of prison security. *See generally Allen v. Coughlin,* 64 F.3d 77 (2d Cir.1995) (finding that fact questions precluded summary judgment in constitutional challenge to DOCS policy disallowing receipt of newspaper clippings by inmates); *Benjamin v. Coughlin,* 905 F.2d 571, 575–76 (2d Cir.1990) (characterizing the constitutional question of whether a DOCS regulation violates the Free Exercise Clause as applied to plaintiffs as "a mixed question of law and fact"). Initially, DOCS' argument that it bans Nation literature because of what it represents and not what it says seems disingenuous given DOCS' prior position in past litigation from the same time period that the literature itself encourages violence.[25] Further, DOCS' repeated references to the impact Five Percenter "rhetoric" has on inmate involvement in gang activities undercuts DOCS' position that the ban is unrelated to the literature's content. *See generally Turner,* 482 U.S. at 90, 107 S.Ct. 2254 ("We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression."). DOCS' claim of content neutrality appears inconsistent with the language used in defendants' submissions—language that suggests that DOCS' ban on Five Percenter assembly and literature is at least in part motivated by a desire to suppress the ideas of Nation members as a group. For example, defendants make the seemingly value-based argument that authorizing access to Five Percenter literature and meeting space would undermine DOCS' policy of "promoting group activity that improves inmate attitudes, encourages constructive use of leisure time, and provides an educational and social experience." *See* Defs.' Mot. at 29; *see also* Def.'s Mot. at 6, 22 (arguing that the ban is content neutral while lamenting the use of "the group's rhetoric" to recruit inmates). Second, although DOCS bans possession of such literature as the 120 Degrees by Nation members, inmates who have registered as NOI may possess some of the exact same material. The position that DOCS has chosen to advance, namely, that one religious group may possess the same materials that if possessed by another contribute to gang formation, is, we think, a challenging one to sustain.[26] *See supra* n. 3.

---

**25.** Beyond DOCS' apparent litigation-driven shift in the justification for same policies previously litigated, it is further difficult to ascertain the terms and justification for DOCS' policy because there is no one regulation or directive that states DOCS' policies with respect to Five Percenters. *See* Tr. of Oral Argt. at 5–7.

**26.** To justify this policy, DOCS argues that "[i]f inmates were allowed to receive Five Percenter literature, the likelihood that the literature would be circulated among inmates undermines DOCS' management of security threat groups...The literature will be used to recruit members, and inmates who possess or display the literature will be identified as members of the Five Percenter [sic] and expose themselves to harm from rival gang members." *See* Defs.' Mot. at 28–29 (internal citations to the record omitted).

■ With respect to the second *Turner* factor, whether Marria has alternative means of exercising his rights, we find that there are disputed material issues of fact in this regard as well. As DOCS argued in *Breland*, defendants contend that plaintiff has alternative means of exercising his free speech and free exercise rights, such as by reading the materials and attending the religious services of other recognized groups (i.e. NOI), as well as discussing Five Percenter principles during meals and recreation. However, plaintiff has put forth substantial evidence that without access to Five Percenter literature and without the ability to discuss that literature with other inmates, he cannot study the lessons that are central to the practice of his religion.[27] While we understand that the law does not entitle plaintiff to every means of expression and free exercise, much of defendants' argument is tantamount to suggesting that if plaintiff can worship as a member of the NOI, constitutional safeguards are satisfied. Marria posits that DOCS' argument is equivalent to providing a Christian with the Old Testament and denying him access to the New Testament, and then arguing that reasonable avenues of speech and religious exercise have been provided. Further, some of the outlets for expression that defendants suggest are available are in fact barred under DOCS' regulations. For example, DOCS' suggestion that plaintiff can study the materials of the NOI is contradicted by the evidence that, in fact, DOCS only permits members of the NOI to have access to these materials and that NOI members are not permitted to show these materials to Nation members. *See* Blocker Decl.; *supra* n. 3.

■ Finally, under the third and fourth *Turner* factors, we consider the impact accommodation would have on prison resources as well as the existence of alternatives to the challenged regulation. DOCS' takes the position with respect to the third *Turner* factor that the impact of accommodating the asserted constitutional right would be a rise in gang violence with a deleterious impact on prison officials, other inmates, and prison resources. Further, DOCS argues that any alternatives to a complete ban on literature and assembly would still undermine DOCS' need to eliminate the presence of such literature from the facilities to prevent the Five Percenter rhetoric from being used to recruit inmates for criminal activities. Plaintiff maintains that material issues of fact exist as to whether accommodation of the asserted right would indeed have the deleterious impact DOCS asserts. Marria further suggests the existence of such viable alternatives as redacting offensive emblems or language, submitting Five Percenter materials to a media review process, and providing plaintiff with a secluded place to read the literature. On the record before us and given the presence of factual issues concerning DOCS' position that Five Percenter literature and assembly cause gang violence, these questions of accommodation and ready alternatives turn on issues of fact that must be resolved at trial. *Breland*, 1997 WL 139533 at *6; *see also*

---

27. With respect to the ban on Five Percenter assembly, DOCS relies on *Benjamin v. Coughlin*, 905 F.2d 571, which upheld the constitutionality of DOCS' directive requiring a religious leader to act as a sponsor for inmate organizations. *Benjamin* fails to support defendants' point, however, because Marria's request for the opportunity to assemble with other Nation members included a request for a spiritual leader, and DOCS' denial of his request was not under the directive requiring a spiritual leader, but rather because "[t]he Nation of Gods and Earths...has been determined by the Department to be an unauthorized, disruptive inmate organization." *See* Marria Decl. Ex. J.

*Turner,* 482 U.S. at 91, 107 S.Ct. 2254 ("[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimus* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.")

We recognize that prison officials are afforded great deference in formulating policies relating to the security of prison facilities. However, given the questions that remain with respect to the link between prison security and DOCS' absolute ban on Five Percenter literature and assembly, viewing the evidence presented in the light most favorable to plaintiff we cannot say that a reasonable finder of fact could not find in Marria's favor. *See generally Show v. Patterson,* 955 F.Supp. 182, 190–91 (S.D.N.Y.1997) (holding that fact issues existed as to whether strip search of Muslim inmates was reasonably related to legitimate penological interest); *Francis v. Keane,* 888 F.Supp. 568, 577 (S.D.N.Y. 1995) (denying summary judgment where two Rastafarian correctional officers challenged DOCS' grooming regulation disallowing dreadlocks, and stating that "grave questions remain with respect to the nexus, if any, between applying the directive to the plaintiffs and the defendants' asserted penological interests, making summary judgment inappropriate"). For this reason, summary judgment is denied with respect to plaintiff's First Amendment claims of free exercise and freedom of expression.

## C. Religious Land Use and Institutionalized Persons Act

Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA") in response to the Supreme Court's holding in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), declaring unconstitutional the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb–1(b). RLUIPA applies both to programs or activities that receive federal financial assistance and to substantial burdens on religious exercise having an effect on interstate commerce. 42 U.S.C. § 2000cc–1(b); *see Mayweathers v. Terhune,* No. Civ. S961582LKKGGHP, 2001 WL 804140, *1 (E.D.Cal. July 2, 2001) (describing RLUIPA and sustaining its constitutional validity). The statute provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution. . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). *See Kikumura v. Hurley,* 242 F.3d 950 (10th Cir.2001) (discussing RLUIPA in the context of an inmate's challenge to a regulation limiting pastoral visits); *Mayweathers* at *2–8. Under RLUIPA, once a plaintiff produces prima facie evidence to support a free exercise violation, the plaintiff bears the burden of persuasion on whether the regulation substantially burdens the plaintiff's exercise of religion and the state bears the burden of persuasion on all other elements. 42 U.S.C. § 2000cc–2(b).

By its terms, RLUIPA is to be construed to broadly favor protection of religious exercise. 42 U.S.C. § 2000cc–3(g). The statute defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of

religious belief." *Id.* § 2000cc–5(7)(A). This reflects an extension of the definition provided for in RFRA, which defined exercise of religion as "the exercise of religion under the First Amendment to the Constitution." 42 U.S.C. § 2000bb–2(4); *Kikumura*, 242 F.3d at 960 (noting the change in definition); *Henderson v. Kennedy*, 265 F.3d 1072, 1074 (C.A.D.C.2001) (noting that the definition of religious exercise in RLUIPA expanded upon the protections of RFRA). However, as suggested by both parties, the otherwise similar language of RFRA and RLUIPA suggests that cases decided under RFRA may guide this Court's inquiry in this case. *See Wyatt v. Terhune*, 280 F.3d 1238 (noting that RLUIPA provides rights similar to those delineated in RFRA); *Henderson*, 265 F.3d at 1074 (noting the expansion in the definition of religious exercise while holding that the amendments to the protections of RFRA "did not alter the propriety of inquiring into the importance of a religious practice when assessing whether a substantial burden exists").

■ Defendants move to dismiss plaintiff's RLUIPA claim on several grounds, some of which have already been addressed during the less demanding First Amendment analysis. Defendants assert that the record does not establish that DOCS ban on Five Percenter literature and access to meeting space substantially burdens the exercise of plaintiff's beliefs. DOCS further asserts that its regulations are in furtherance of a compelling governmental interest in prison security and that the ban on Five Percenter literature and access to facility meeting space is the least

restrictive means of controlling security threat group behavior.

Like its predecessor RFRA, RLUIPA requires a plaintiff to demonstrate that his right to free exercise of religion has been substantially burdened. The Supreme Court has defined substantial burden as "[w]here the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 717–18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Jolly*, 76 F.3d at 477 (citing this passage of *Thomas* with approval in considering Rastafarian inmate's RFRA claim). Defendants' argument that plaintiff has not demonstrated a substantial burden on his religious exercise is unpersuasive. Throughout this litigation, Marria has maintained that the study of the Supreme Mathematics, the Supreme Alphabet, the 120 Degrees, and other lessons found in *The Five Percenter*—both by himself and with other Nation members—is an integral part of the daily practice of Nation beliefs.[28] There is no question that under DOCS' regulations, plaintiff is denied the opportunity to possess these materials and study them with other inmates.

Having held that serious questions exist as to whether DOCS' absolute ban on Five Percenter literature and assembly is reasonably related to DOCS' legitimate interest in prison security, these same questions clearly preclude summary judgment under RLUIPA's requirement that a substantial burden of free exercise be in furtherance of a compelling governmental

---

**28.** Defendants argument that Marria conceded at his deposition that he has been able to practice his Five Percenter beliefs both mischaracterizes Marria's deposition testimony and contradicts the submitted evidence. For example, Marria never conceded that he can receive NOI lessons, and has further submitted evidence that under DOCS regulations, only registered members of NOI have access to such materials. *See* Vullo Decl. Ex. G., Marria Depo. at 24–27; Blocker Decl.

interest. Further, on this record, the question of whether DOCS' ban on the literature and assembly of Nation members is the least restrictive alternative raises questions of fact barring summary judgment. *See Ramirez v. Coughlin,* 919 F.Supp. 617, 621–22 (N.D.N.Y.1996) (denying summary judgment to DOCS on Satanist inmate's RFRA claim and holding that fact issues existed as to whether denial of access to three-inch metal bell for Satanist ceremonies was least restrictive alternative). Accordingly, summary judgment is denied with respect to plaintiff's claim under RLUIPA.

## D. Due Process

In addition to his First Amendment and RLUIPA claims, plaintiff asserts a due process claim. Marria's due process argument is that his procedural due process rights were violated because his issues of *The Five Percenter* were not evaluated in accordance with Directive # 4572, entitled "Media Review."[29] Marria asserts that

29. Plaintiff is not challenging the loss or destruction of his property. While there is no question that he has a property interest in the newspapers, even if they were of minimal monetary value, *Parratt v. Taylor,* 451 U.S. 527, 536, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the loss or destruction due to the negligence of the defendants would not rise to the level of a constitutional deprivation under § 1983. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Herrera v. Scully,* 815 F.Supp. 713, 721–24 (S.D.N.Y.1993).

30. In its entirety, Rule 105.12 of the Standards of Inmate Behavior provides,

Unauthorized Organizational Activity
Inmates shall not engage or encourage others to engage in unauthorized organizational activities or meetings, display, wear, possess, distribute, or use unauthorized organizational insignia or materials.
An unauthorized organization is any gang; [sic] or organization which has not been approved by the Deputy Commissioner for Program Services.

the media review regulation is the only operative procedure for evaluating a newspaper sent to an inmate by a publisher, and therefore, that DOCS' failure to abide by their own policy denied him due process of law. *See supra* n. 6; Blaetz Decl. Ex. A; *see generally Allen v. Coughlin,* 64 F.3d 77, 78–79 (2d Cir.1995) (discussing media review guidelines).

In response, DOCS challenges Marria's reliance on the media review directive as the exclusive basis for its evaluation of *The Five Percenter.* Rather, DOCS maintains that its internal regulations relating to contraband are applicable and that in any event, ample procedural safeguards were actually provided. Specifically, DOCS points to such internal regulations as Rule 105.12, which defines contraband,[30] DOCS Directive # 4422, which describes the procedures for searching inmate correspondence for contraband and then disposing of it,[31] and a central office memorandum to all prison superintendents, which describes the handling of Five Percenter materials.[32]

*See* Blaetz Decl. Ex. E.

31. Section G of Directive # 4422, which is entitled "Inmate Correspondence Program," governs procedures for incoming mail. In Part 1, it provides that all incoming mail is opened and inspected for certain items including contraband, but then refers the reader to Directive # 4572 for publications deemed to be unacceptable. When unauthorized items (i.e. contraband) are found in inmate correspondence, an inmate is given the choice of returning the items to the sender or otherwise disposing of them at his own expense. If, after 30 days the inmate is unable to pay for the disposal of the contraband, it is donated or destroyed. *See* Blaetz Decl. Ex. G.

32. Promulgated after the facts that gave rise to this cause of action took place, this memorandum informs superintendents that Five Percenter materials are deemed contraband under Rule 105.12, are not subject to media review, and should be confiscated pursuant to contraband procedures. *See* Blaetz Decl. Ex. F.

*See* Defs.' Reply Mem. at 27; Blaetz Decl. Ex. G. *See generally Webster v. Mann,* 917 F.Supp. 185, 187 (W.D.N.Y.1996) (discussing Directive # 4422 in the course of holding that even if internal regulations were violated by prison official's acts in reading and confiscating inmate's mail, such a violation was not a sufficient basis for a § 1983 claim); *Minigan v. Irvin,* 977 F.Supp. 607, 609 (W.D.N.Y.1997) (reviewing cases that have upheld the constitutional validity of Directive # 4422).

We reject Marria's argument for several reasons. First, the question of the adequacy of procedures for a content-based review seems to fall more appropriately within plaintiff's First Amendment argument. Second, defendants have submitted substantial evidence that the media review directive does not determine the procedures to be followed for the handling of incoming correspondence that has been classified as contraband,[33] and therefore, that they did not deliberately fail to follow internal policy. Thus, we come full circle. The treatment of *The Five Percenter* hinges on the sustainability of DOCS' classification of the Five Percenters as a security threat group and the related ban on all Five Percenter literature, issues that we have already found not ripe for resolution on summary judgment. However, as discussed in the next section, because plaintiff's due process claim is dismissed on the grounds of qualified immunity, we need not separately resolve defendants' motion for summary judgment on plaintiff's due process claim.

**E. Qualified Immunity**

The doctrine of qualified immunity has traditionally operated to shield state officials from liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In this case, plaintiff concedes that qualified immunity is appropriate with respect to his First Amendment and RLUIPA claims, and seeks monetary damages only for alleged violations of his procedural due process rights. As a preliminary consideration, we review the involvement of each of the defendants in the confiscation of plaintiff's literature. Defendant Blaetz, then Chair of the Media Review Committee at Green Haven, realized that plaintiff's March and April issues of *The Five Percenter* had been incorrectly submitted to the Media Review Committee. Pursuant to DOCS' policy, she forwarded the newspapers to Umar, then the Coordinator of Islamic Affairs, for a determination of whether the literature was permissible as NOI literature or contraband as material pertaining to a security threat group. *See* Blaetz Decl. Defendant Umar, in response and also pursuant to DOCS policy, reviewed the newspapers and determined that they were contraband under DOCS' policy. He then notified a counselor at Green Haven that the literature was contraband and that Marria was not permitted to receive it. *See* Umar Decl. Defendant Broaddus's involvement in the confiscation of defendant's literature was restricted to responding to plaintiff's inquiry as to the status of

---

33. Surely, for example, DOCS would not be obligated to direct literature promoting the Latin Kings through the media review process for a determination of whether the materials' content furthers gang activity. *Cf. Nogueras v. Coughlin,* No. 94 Civ. 4094(JSM), 1996 WL 487951, *3 (S.D.N.Y. Aug. 27, 1996) (discussing Latin Kings literature and holding that under the *Turner* factors, "the Department's policies requiring groups to be authorized and deeming unauthorized groups' materials contraband are reasonably related to the valid penological interests of . . . containing gang activity and inmate violence.")

his newspapers, informing him that media review was inapplicable to his publications and that they had been sent to Umar for review. Finally, defendant Goord, who did not commence his employment as the Commissioner of DOCS until after the March and April newspapers had been confiscated,[34] forwarded Marria's inquiry to Broaddus for response.

For a defendant to secure summary judgment on the ground of qualified immunity, he must show "that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *See Ford v. Moore*, 237 F.3d 156, 162–63 (2d Cir.2001) (citing *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)). State officials seeking qualified immunity are shielded from liability for monetary damages if, at the time they acted, either (1) their conduct "did not violate clearly established rights of which a reasonable person would have known," or (2) "it was objectively reasonable to believe that [their] acts did not violate these clearly established rights." *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir.1993) (internal quotations omitted) (quoting *Finnegan v. Fountain*, 915 F.2d 817, 823 (2d Cir.1990)); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In determining whether a particular right was clearly established at the time defendants acted, a court considers the following factors:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right

in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.1993) (citing *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991), *cert. denied*, 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992)).

Based on our discussion earlier in this Opinion, it is clear that the status of the Five Percenters as a security threat group is an unsettled question. Similarly, neither the Supreme Court nor the Second Circuit have ruled on the constitutional protection to be accorded Five Percenter literature. *See Graham* at *8. Under these circumstances, the participation by these defendants in carrying out DOCS' policies for evaluating and confiscating *The Five Percenter* as contraband cannot be considered objectively unreasonable in light of clearly established law. *See Green v. Bauvi*, 46 F.3d 189 (2d Cir.1995) (noting that the fact that officials complied with state regulations is a factor in determining whether a reasonable official would have known his actions violated the Constitution). Summary judgment is therefore granted with respect to defendants' assertion of qualified immunity.

## F. State Law

Defendants move to dismiss the claims asserted under the free exercise protections of Article 1 of the New York State Constitution and Section 610 of the New York Correction Law, arguing that claims for damages against DOCS employees in their personal capacities for acts conducted

---

**34.** We note the well-established rule that liability for damages under § 1983 requires personal involvement by the individual defendant in the alleged constitutional violation. *Gaston v. Coughlin*, 249 F.3d 156 (2d Cir.2001);

*McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Clearly, Goord cannot be liable for acts occurring prior to his employment.

302

within the scope of their employment are barred under New York Correction Law § 24.[35] Because plaintiff does not seek monetary damages under these provisions, we need not address this argument further. *See* Pl.'s Mem. in Opp'n at 9 n.2; *Baker v. Coughlin,* 77 F.3d 12 (2d Cir. 1996).

## CONCLUSION

For the foregoing reasons, defendants' motion to exclude the Bair Report is denied and plaintiff's motion to exclude the Camp Report is granted. Further, defendants' motion for summary judgment is denied as to plaintiff's First Amendment and RLUIPA claims, and defendants' motion to dismiss plaintiff's due process claim on qualified immunity grounds is granted. A conference has been scheduled to discuss further proceedings in this matter for April 18, 2002, at 4:00 p.m.

**IT IS SO ORDERED.**

---

**35.** New York Correction Law § 24 provides in pertinent part:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the [Department of Correctional Services], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the [Department of Correctional Services] shall be brought and maintained in the court of claims as a claim against the state.