**Henry WILLIAMS, Plaintiff**

v.

**Robert S. BITNER, et al., Defendants**

**No. CIV.A.1:01–CV–2271.**

United States District Court,
M.D. Pennsylvania.

Feb. 22, 2005.

David L. Glassman, Lewisburg, PA, for Plaintiff.

Raymond W. Dorian, Office of Chief Counsel PA, Camp Hill, PA, Roman P. Storzer, Sara W. Clash–Drexler, Theodore C. Hirt, United States Department of Justice, Washington, DC, Anne K. Fiorenza, Office of the United States Trustee U.S. Attorney's Office, D. Brian Simpson, U.S. Attorney's Office, Harrisburg, PA, for Defendants.

*MEMORANDUM*

CONNER, District Judge.

Presently before the court is a motion for summary judgment by defendants, employees and officials of the Pennsylvania Department of Corrections. They argue that plaintiff Henry Williams ("Williams"), an inmate at a Pennsylvania corrections institution, has offered insufficient evidence to sustain his claims under 42 U.S.C. § 1983 for violations of his rights to free exercise of religion, protected by both the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc–5, and the First Amendment, and to due process of law, protected by the Fourteenth Amendment. The motion will be granted in part and denied in part.

## I. *Statement of Facts* [1]

Swine are considered unclean by many adherents to the Islamic faith, most of whom refuse to consume pork. Some read these creeds more strictly to prohibit handling or aiding others to consume pork in any circumstances. Williams ascribes to this interpretation, and has done so with apparent consistency throughout his incarceration. (Doc. 62, Ex. 1 at 6, 8–10, 16–17, 20–24; Doc. 62, Ex. 9 ¶¶ 16, 20; Doc. 67, Exs. D, M; Doc. 73, Ex. EE ¶¶ 6, 9).

When Williams was assigned to work as a cook by prison officials,[2] he expressed his concerns over contact with pork to the "head" inmate-cooks, who coordinated other inmates' daily responsibilities in the kitchen. He notified them that, as a practicing Muslim, he could not touch pork or assist in its preparation. They agreed to accommodate his concerns by transferring

---

1. In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to plaintiff, as the non-moving party. *See infra* Part II.

2. Williams did not apply for and did not want to work as a cook in the kitchen. (Doc. 60 ¶ 12; Doc. 62, Ex. 1 at 30–31; Doc. 65 ¶ 12).

him to another assignment when pork was served for lunch. It is unclear from the record whether this accommodation was recognized by prison officials.[3] (Doc. 67, Exs. B, C).

This arrangement apparently worked well until March 3, 2001. Williams's shift on this day started as normal; he worked as a cook in the morning and transferred to another position when lunch preparations involving pork commenced. Soon thereafter, however, defendant Scott Wyland ("Wyland"), one of the institution's food service instructors, noticed that there was a shortage of available inmate-cooks. Although the lunch preparations were half-complete and would likely be finished in time for meal service, he directed Williams to resume his position as cook and to assist in the dividing of pork rations. (Doc. 19 ¶¶ 30–31; Doc. 50 ¶¶ 30–31; Doc. 60 ¶ 13; Doc. 62, Ex. 1; Doc. 65 ¶ 13; Doc. 67, Exs. B, C).

Williams refused, citing his religious beliefs. Wyland reported this to defendant Gary Emel ("Emel"), the food service supervisor. Emel approached Williams and ordered him to assist in lunch preparations. Wyland indicated that Williams could wear gloves, an accommodation that other Muslim inmates had previously found acceptable. Williams again refused, stating that he would still be violating his faith by assisting others to consume pork. Emel responded by telling Williams that he was fired from his employment for failing to follow orders. He advised Wyland to issue a misconduct to Williams. (Doc. 19 ¶¶ 32–35; Doc. 50 ¶¶ 32–35; Doc. 60 ¶¶ 13–14; Doc. 62, Ex. 1; Doc. 63 ¶¶ 8–9; Doc. 65 ¶¶ 13–14).

Pursuant to institution policy, Wyland notified defendant, George Snedeker ("Snedeker"), a prison captain, of the inci-

dent and requested approval for issuance of a misconduct against Williams. Snedeker agreed. He determined that the matter should not be referred to informal resolution, as permitted by prison regulations, "because of the seriousness of the incident." He approved the misconduct, and it was issued under Wyland's name. (Doc. 19 ¶¶ 35–36; Doc. 50 ¶¶ 35–36; Doc. 60 ¶ 14; Doc. 62, Exs. 1, 8; Doc. 63 ¶ 14; Doc. 67, Exs. E, DD).

A disciplinary hearing was conducted on March 6, 2001, by defendant Jay Stidd ("Stidd"), a corrections hearing examiner. Prior to the hearing, Williams submitted a written defense, citing federal caselaw suggesting that inmates cannot be forced to assist in the preparation of pork, and requested that one of the institution's Muslim chaplains be called as a witness. Stidd refused the request, and found Williams guilty of refusing to obey an order. As a sanction, Williams was placed on "cell restriction," meaning that he could leave his cell only for daily meals and weekly religious services, for thirty days. (Doc. 19 ¶¶ 37–42; Doc. 50 ¶¶ 37–42; Doc. 60 ¶ 14; Doc. 62, Ex. 1; Doc. 63 ¶ 14; Doc. 67, Exs. F, I).

Williams appealed to the institution's "Program Review Committee." Membership of the Committee included defendants Robert Kerstetter ("Kerstetter"), G.P. Gaertner ("Gaertner"), and Frank Tennis ("Tennis"). Defendant Terry Whitman ("Whitman"), deputy superintendent of the institution, was not a member of the Committee, but he "was aware of the matter [involving Williams] and drafted the decision eventually adopted." That decision affirmed Stidd's determination. It noted that a member of the institution's chaplaincy had been contacted and had indicated

---

3. The prison does provide an alternative meal for Muslim inmates when pork is served.

(Doc. 60 ¶ 8; Doc. 62, Ex. 1 at 16–17; Doc. 65 ¶ 8).

that Islamic teachings can be interpreted to allow adherents to touch pork while wearing gloves. William's subsequent appeals to defendants Robert Meyers ("Meyers"), superintendent of the institution, and Robert Bitner ("Bitner"), the chief hearing examiner, were denied on similar grounds. (Doc. 19 ¶¶ 43–51; Doc. 50 ¶¶ 43–51; Doc. 60 ¶ 19; Doc. 62, Ex. 1; Doc. 63 ¶ 19; Doc. 67, Exs. J–K, O, P, R–V; Doc. 67, Ex. L ¶ 3).

As a result of the misconduct, Williams's security classification was raised from "low" to "medium." He served twenty-seven days on cell restriction, missing one religious observance as a result, before being discharged. (Doc. 60 ¶¶ 20–21; Doc. 62, Ex. 1; Doc. 63 ¶¶ 20–21).

Williams filed the complaint *sub judice* in November 2001, asserting that prison officials had violated his rights under the RLUIPA and the First and Fourteenth Amendments to the United States Constitution. A motion to dismiss filed by defendants, on grounds that the RLUIPA is unconstitutional, was denied in September 2003.[4] Discovery ensued, and the instant motion for summary judgment was filed in May 2004. (Docs. 19, 21, 47, 59).

## II. *Standard of Review*

"Summary judgment serves as a minimal but important hurdle for litigants to overcome before presenting a claim to a jury." *Pappas v. City of Lebanon,* 331 F.Supp.2d 311, 314 (M.D.Pa.2004). Faced with such a motion, the adverse party must produce affirmative evidence, beyond the disputed allegations of the pleadings, in support of the claim. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett,* 477

U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Pappas,* 331 F.Supp.2d at 314. "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana v. Kmart Corp.,* 260 F.3d 228, 231–32 (3d Cir.2001) (quoting *Williams v. Borough of West Chester,* 891 F.2d 458, 460–61 (3d Cir.1989)). Only if this burden is met can the cause of action proceed. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–89, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see* FED. R. CIV. P. 56(c), (e).

## III. *Discussion*

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. *See* 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

*Id.; see also Gonzaga Univ. v. Doe,* 536 U.S. 273, 284–85, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). To establish a civil

---

4. A more extensive discussion of this holding is presented in the court's previous decision, *Williams v. Bitner,* 285 F.Supp.2d 593 (M.D.Pa.2003), familiarity with which is presumed. The constitutionality of the RLUIPA is currently under consideration by the Supreme Court. *See Cutter v. Wilkinson,* —— U.S. ——, 125 S.Ct. 308, 160 L.Ed.2d 221 (2004) (granting cert.).

rights claim, the plaintiff must show a "deprivation" of a constitutional or statutory right by a person "acting under color of state law." *Id.*

Satisfaction of these elements, however, does not guarantee recovery. Certain officials, including police officers and other state actors who perform "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." *Saucier v. Katz,* 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). This doctrine, known as "qualified immunity," provides not only a defense to liability, but "immunity from suit." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). To gain the protection of the doctrine, the defendant must show either that (1) the plaintiff has not demonstrated "a deprivation of an actual constitutional right" or (2) the right at issue was not "clearly established at the time of the alleged violation." *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999).

Williams claims that defendants violated his rights under the RLUIPA and the Free Exercise Clause of the First Amendment by ordering him to handle pork and under the Due Process Clause of the Fourteenth Amendment by according him inadequate procedural protections during the disciplinary hearing. The court will analyze these claims in turn.

## A. *RLUIPA*

Incarcerated persons enjoy a statutory right to follow the religious teachings and practices of their choice. The RLUIPA provides, in pertinent part, as follows:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). A burden is "substantial" when it "influences the adherent to act in a way that violates his [sincerely held] religious beliefs." *Adkins v. Kaspar,* 393 F.3d 559, 568–71 (5th Cir. 2004) (citing *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450–51, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988); *Thomas v. Review Bd.,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)); *accord DeHart v. Horn,* 227 F.3d 47, 52 (3d Cir.2000).[5]

The evidence in this case would permit a reasonable finder of fact to conclude that defendants' actions constituted a "substantial burden" on Williams's sincere religious beliefs. Initially, it seems undisputed that Williams truly believed that his religion forbade him to assist others in consuming pork. While defendants argue that other Muslims interpret these creeds less strictly, permitting adherents to prepare pork while wearing gloves, they do not cast doubt on the sincerity of

---

**5.** *See also* 42 U.S.C. § 2000cc–5(7)(A) ("The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.").

Williams's interpretation.[6] And, for purposes of the RLUIPA, it matters not whether the inmate's religious belief is shared by ten or tens of millions. All that matters is whether the inmate is sincere in his or her own views. *See id.* at 51–52, 55–56 (citing *Africa v. Pennsylvania,* 662 F.2d 1025, 1029–30 (3d Cir.1981)). No evidence suggests that Williams was insincere in his.

The issuance of a misconduct and sanction of cell restriction could constitute a "substantial burden" on these beliefs. *See* 42 U.S.C. § 2000cc–1(a). These punitive measures were threatened, and later imposed, by prison officials to induce Williams to assist in the preparation of pork. The misconduct carried with it an increase in Williams's security classification, precluding him from certain benefits, and the cell restriction limited his freedom of movement for several weeks, forcing him to miss a religious ceremony. Williams was placed in the unenviable position of choosing between punishment by prison officials or observance of religious teachings. This is the type of choice that the RLUIPA was enacted to prevent. *See Adkins,* 393 F.3d at 568–71. A factfinder could reasonably conclude that defendants' actions substantially burdened Williams's religious exercise. *Accord Hayes v. Long,*

72 F.3d 70, 72–74 (8th Cir.1995) (reversing district court's grant of summary judgment on factually analogous claims).

The evidence does not compel a finding that the actions of prison officials were the "least restrictive means" of furthering a "compelling" interest. *See* 42 U.S.C. § 2000cc–1(a). Maintaining institutional order and security is certainly a compelling interest. *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Kikumura v. Hurley,* 242 F.3d 950, 962 (10th Cir.2001). But the actions taken here did not further that interest. Williams was apparently not acting improperly or being disruptive on March 3, 2005. He was completing the tasks to which he had been assigned in the kitchen. He objected only when officials directed him to assist in activities that violated his sincere religious beliefs, and these protests were limited to a simple refusal and explanation, without threat or show of disrespect. No disturbance was seemingly caused by Williams's actions, and issuance of a misconduct was not necessary to ensure inmate discipline.[7]

Nor were these actions clearly required to ensure timely food preparation.[8] Other inmates were available as cooks, and had purportedly completed half of the pork rationing. While the kitchen was appar-

***

**6.** It may be noted that Williams is apparently not alone in his interpretation of Islamic teachings. (Doc. 67, Exs. D, M; Doc. 73, Ex. EE ¶¶ 6, 9).

**7.** Some evidence of record suggests that Williams's refusal was overheard by other inmates (*see* Doc. 62, Ex. 1 at 41–45), and defendants contend that, if officials had not disciplined Williams, institutional security would have been threatened. This is a tenable argument—and may later carry the day— but, in light of conflicting testimony regarding the persons present at the incident (*compare* Doc. 62, Ex. 1 at 41–45, *and* Doc. 67, Exs. B, C, *with* Doc. 62, Ex. 8 ¶¶ 4–6; Doc. 63 ¶¶ 8– 9), the court is unable to find on the summary

judgment record that other inmates were aware of Williams's reaction to the order. Defendants will, of course, be free to offer additional evidence at trial to support their assertion that, if staff had not been permitted to discipline Williams in this circumstance, "chaos w[ould have] reign[ed]" (Doc. 61 at 8). *See also supra* note 1 (noting standard of review).

**8.** The court assumes without deciding that timely food preparation, which defendants link to institutional security (Doc. 61 at 7 ("If [inmates] are not fed on time or in a satisfactory manner, the place could explode.")), could constitute a "compelling" interest.

ently short-staffed on March 3, 2005, there is no evidence that this shortage threatened to delay meal preparation or otherwise to impact the daily meal schedule. Moreover, Williams had been transferred to a different position on several previous occasions, with no concomitant loss of efficiency. A reasonable finder of fact could conclude that ordering Williams to assist in pork preparations and issuing him a misconduct for refusing to comply were not the least restrictive means of furthering compelling government interests.

If established, the deprivation of Williams's rights under the RLUIPA is likely attributable to all defendants, each of whom reviewed and approved of the misconduct in some manner. *See C.H. ex rel. Z.H. v. Oliva,* 226 F.3d 198, 201–02 (3d Cir.2000) ("[A] defendant in a civil rights case can[ ] be held responsible for a constitutional violation [in] which he or she [ ]either participated … [ ]or approved."). Wyland and Emel directed Williams to prepare the pork. Wyland issued a misconduct under the direction of Emel and with the approval of Snedeker. Stidd sanctioned Williams to the cell restriction. Kerstetter, Gaertner, and Tennis denied Williams's appeal in a decision drafted by Whitman. Meyers and Bitner dismissed Williams's final appeals. All of the defendants reviewed the facts relevant to Williams's current claims, and all approved of the decision to issue a misconduct for his refusal to obey the order to assist in the preparation of pork.[9] All are now potentially liable. *See id.*

█ And none are protected by qualified immunity. The court previously rejected defendants' argument that the right of Muslim inmates to avoid handling pork

was not "clearly established" at the time of these incidents, *see Williams v. Bitner,* 285 F.Supp.2d 593, 604–05 (M.D.Pa.2003), and now reaffirms this holding. The few courts to consider the precise question have uniformly held that prison officials must respect and accommodate, when practicable, a Muslim inmate's religious beliefs regarding prohibitions on the handling of pork. *See Hayes,* 72 F.3d at 72–74; *Kenner v. Phelps,* 605 F.2d 850, 851 (5th Cir.1979); *Chapman v. Kleindienst,* 507 F.2d 1246, 1251–52 (7th Cir.1974); *Finney v. Hutto,* 410 F.Supp. 251, 270 (E.D.Ark.1976), *aff'd on other grounds,* 548 F.2d 740 (8th Cir.1977), *aff'd,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Decisions from the Supreme Court and the Third Circuit Court of Appeals affirm these principles, albeit in different factual scenarios. *See, e.g., Thomas,* 450 U.S. at 717–18, 101 S.Ct. 1425; *Sherbert,* 374 U.S. at 404, 83 S.Ct. 1790; *DeHart,* 227 F.3d at 59–60 & n. 8; *Johnson v. Horn,* 150 F.3d 276, 283 (3d Cir.1998), *overruled in part by DeHart,* 227 F.3d at 54–57; *see also Turner v. Safley,* 482 U.S. 78, 87–89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Despite the lack of binding "on point"[10] precedent, the court finds that Supreme Court and Third Circuit decisions regarding religious liberty in the prison context were sufficiently developed by 2001 to inform defendants that they had a constitutional obligation to accommodate Williams's sincerely held beliefs in this circumstance. *Williams,* 285 F.Supp.2d at 604–05; *accord Hayes,* 72 F.3d at 72–74; *see also Saucier,* 533 U.S. at 200–01, 121 S.Ct. 2151.

The single unreported case cited by defendants is not to the contrary. In *Robinson v. Jordan,* 900 F.2d 260, 1990 WL

9. The court reiterates that this discussion is premised on a view of the evidence in the light most favorable to Williams. *See supra* note 1.

10. (Doc. 68 at 6)

47551 (6th Cir.1990), the Sixth Circuit held that a prisoner who was terminated from his kitchen employment when he refused to assist in preparation of pork products did not suffer a cognizable constitutional infringement. *Id.* But, unlike the plaintiff in *Robinson*, Williams was not merely terminated from his employment; he was issued a misconduct and suffered other sanctions as a consequence of his religious exercise. *Cf. id.* Moreover, the plaintiff in *Robinson* had apparently sought his position, whereas Williams was assigned to work as a cook against his wishes. *Cf. id.* In sum, Williams was involuntarily placed in a position where his religious beliefs may be violated and then ordered to take specific actions that would, in fact, violate them.

That this order could infringe Williams's rights under the RLUIPA should have been clear to defendants at the time of these events. *See Hayes*, 72 F.3d at 72–74; *Williams*, 285 F.Supp.2d at 604–05. Indeed, Williams took several opportunities to alert them to caselaw making this very point. These officials are not entitled to qualified immunity. *See Saucier*, 533 U.S. at 200–01, 121 S.Ct. 2151. Williams's claims under the RLUIPA may proceed.

## B. *Free Exercise Clause*

■ The First Amendment imposes similar, but less strict, standards on prison administrators than the RLUIPA. *See Williams*, 285 F.Supp.2d at 605. Officials may regulate inmate behavior, even if their directives burden religious beliefs or practices, when reasonably necessary to further "legitimate penological objectives." *Turner*, 482 U.S. at 87–89, 107 S.Ct. 2254; *see also Williams v. Morton*, 343 F.3d 212, 216–17 (3d Cir.2003). A regulation or practice is constitutional so long as it is rationally related to a legitimate administrative goal and is reasonable in light of the burden on the inmate and alternatives available to the institution "at *de minimis* cost to valid penological interests." [11] *Turner*, 482 U.S. at 87–89, 107 S.Ct. 2254; *see DeHart*, 227 F.3d at 52–60.

Much of the previous discussion under the RLUIPA applies in this context, and need not be repeated. Williams sincerely believed that his religion forbade him to assist in the preparation of pork. *See id.* at 50–51. The order directing him to do so plausibly constituted a substantial burden on Williams's religious exercise and did not further institutional interests in security or prompt food preparation.[12]

Nor was the order clearly reasonable in light of the potential burden on prison officials and the alternatives available to further penological goals. Accommodating Williams in this circumstance likely would not have led to calls from other inmates for similar treatment or had other adverse effects on prison administration.[13] *See Turner*, 482 U.S. at 90, 107 S.Ct. 2254 (stating that courts should consider whether "accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff"); *cf.*

---

**11.** Defendants do not assert, and the record does not suggest, that Williams was required to serve pork under a "neutral [regulation] of general applicability," which would arguably mandate a more restrictive constitutional analysis. *See Employment Div. v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'") (quoting *United States v. Lee*, 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring in judgment)).

**12.** *See supra* text accompanying notes 7–8.

**13.** *See supra* note 7 and accompanying text.

*DeHart,* 227 F.3d at 58 (citing evidence that other inmates would "demand similar treatment" as demonstrating burden on prison administrators of accommodation). There was apparently no need for additional cooks at the time of the order, and lunch preparation had been completed in a timely manner on other occasions when kitchen staff allowed Williams to transfer positions.[14] *See Turner,* 482 U.S. at 89, 107 S.Ct. 2254 (stating that court should consider whether official action was rationally related to penological interest). Moreover, even if additional kitchen assistance was necessary on that day, prison officials presumably could have fired Williams from his job (an act that probably would not have constituted a constitutional violation, *see Robinson,* 900 F.2d 260, 1990 WL 47551) and replaced him with another inmate without difficulty.[15] This alternative would have secured another cook at little if any cost to the prison. *See Turner,* 482 U.S. at 87–89, 107 S.Ct. 2254 (stating that, in deciding whether a regulation is reasonable, courts should consider "if . . . an alternative . . . fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests").

That Williams possessed other means to express his beliefs, including prayer, attendance at religious services, and special meal arrangements, does not necessarily render defendants' actions constitutional. The availability of these alternative modes of expression may have ameliorated the burden on Williams's overall exercise of his faith, but these options do not enervate Williams's faith-based interest in avoiding contact with pork. *See DeHart,* 227 F.3d at 53–57 (stating that court should consider impact on inmate's religious exercise in light of inmate's sincere belief in practice

at issue and availability of "alternative means of practicing his or her religion generally") (citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 351–52, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). While the presence of "other avenues" for religious worship lends support to defendants' position, this factor does not outweigh other relevant considerations, all of which suggest that defendants' actions were unreasonable in light of legitimate penological interests. *See id.* at 59 (stating that court must balance relevant factors to "determine whether the regulation is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protected activity") (citing *Turner,* 482 U.S. at 90, 107 S.Ct. 2254).

■ Viewed in the light most favorable to Williams, the evidence establishes a violation of his right to free exercise of religion. *See Sutton v. Rasheed,* 323 F.3d 236, 257–58 (3d Cir.2003). Defendants should have known under governing law that their actions would constitute a deprivation of this constitutional right, and are not entitled to qualified immunity. *See Williams,* 285 F.Supp.2d at 604–05; *see also Saucier,* 533 U.S. at 200–01, 121 S.Ct. 2151. Williams's claims under the First Amendment may proceed to trial.

### C. *Fourteenth Amendment*

■ The Fourteenth Amendment to the United States Constitution provides: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV. The threshold issue of due process analysis is whether the person has been suffered a

---

**14.** *See supra* note 8 and accompanying text.

**15.** Defendants acknowledge that, unlike Williams (Doc. 62, Ex. 1 at 30–31), many

inmates actively seek assignment to the cook's position, which "pays more than other jobs in the kitchen" (Doc. 60 ¶ 12).

"deprivation" of "life, liberty, or property." *Pappas*, 331 F.Supp.2d at 315–16.

 Williams has failed to meet this prerequisite. Changes in confinement of an inmate will result in a deprivation of protected interest only when they impose "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 485, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). No evidence suggests that the thirty-day cell restriction marked a "dramatic departure" from normal confinement, particularly because Williams was still permitted to attend meals and religious services with the general population. *Cf. id.* at 485–87, 115 S.Ct. 2293 (noting that solitary confinement is not a deprivation of liberty *per se*). The restrictions imposed on Williams did not differ significantly from those imposed on other inmates, and he cannot establish a deprivation of a protected interest.[16] His claims under the Due Process Clause cannot proceed.

## IV. *Conclusion*

At this stage of the proceedings, and with the benefit of a favorable view of the record, Williams has offered sufficient evidence to establish a deprivation of his rights under the RLUIPA and the First Amendment for which all defendants may be liable under 42 U.S.C. § 1983. However, the same cannot be said with respect to the asserted deprivation of his rights to due process under the Fourteenth Amendment, and summary judgment will be granted in favor of defendants on these claims.

An appropriate order will issue.

## ORDER

AND NOW, this 22nd day of February, 2005, upon consideration of defendants' motion for summary judgment (Doc. 59), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motion (Doc. 59) is GRANTED with respect to plaintiff's claims under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment and is otherwise DENIED. The Clerk of Court is directed to defer the entry of judgment until the conclusion of this case.

---

**16.** Nevertheless, the court notes that defendants have not offered *any* explanation for the hearing examiner's denial of Williams's request to allow one of the institution's Muslim chaplains to testify in his behalf at the disciplinary hearing. While prison officials maintain discretion to refuse production of witnesses, they must offer a valid penological reason—either at the time of the hearing or during a later civil rights action—for doing so. *Ponte v. Real*, 471 U.S. 491, 495–98, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985) (citing

*Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). Defendants' bare assertion that the decision "was within the [h]earing [e]xaminer's prerogative" (Doc. 68 at 11) would not satisfy constitutional due process standards. *See Ponte*, 471 U.S. at 495–98, 105 S.Ct. 2192. Of course, since Williams did not suffer a deprivation of "liberty" as a result of the hearing, no liability attaches for this potential procedural defect. *See Pappas*, 331 F.Supp.2d at 315–16.