929 A.2d 1139 (2007)
395 N.J. Super. 548
Mortimer HETSBERGER, Plaintiff-Appellant
v.
DEPARTMENT OF CORRECTIONS and George W. Hayman, Commissioner,[1] Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted March 27, 2007.
Decided August 24, 2007.
*1140 Mortimer Hetsberger, appellant pro se.
Stuart Rabner, Attorney General, for respondent (Patrick DeAlmeida, Assistant Attorney General, of counsel; Dewan N. Arefin, Deputy Attorney General, on the brief).
Before Judges KESTIN, WEISSBARD and LIHOTZ.
The opinion of the court was delivered by
KESTIN, P.J.A.D. (retired and temporarily assigned on recall).
Plaintiff, Mortimer Hetsberger, appeals from the summary judgment dismissal of his single-count complaint filed against the Department of Corrections (DOC or the Department) and the Commissioner of the Department. The only claim for relief asserted in the complaint charged that Department regulations and actions "impose[ ] a substantial burden on plaintiff's religious exercise, in violation of the Religious Land Use and Institutionalized Persons Act of 2000, [(RLUIPA)], 42 U.S.C.A. § 2000cc-1"; however, in the complaint's "preliminary statement," plaintiff also invoked 42 U.S.C.A. § 1983. Plaintiff sought an injunction permitting him to participate in practices he outlined in the complaint that he viewed as central to his religious beliefs, and he also sought $100,000 in compensatory damages.
In a letter opinion dated April 10, 2006, the motion judge expressed the reasons for his ruling dismissing the claim for injunctive relief.[2] The rationale employed relied solely on two cases addressing claims of First Amendment violations. Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), predated the adoption of RLUIPA; and Fraise v. Terhune, 283 F.3d 506 (3d Cir.2002), did not consider that relatively recently enacted statute, noting that such issues had not been raised. See id. at 515 n. 5. The judge in the instant matter made no mention of RLUIPA or of the allegations of the complaint invoking that statute.
The criteria governing RLUIPA claims are different in particular ways from those standards employing First Amendment considerations. In order to apply RLUIPA standards, a determination must be made, not only that a compelling State interest is involved, but also as to whether the Department's policies represent the least restrictive means of furthering the compelling governmental interest. Accordingly, we vacate the order of dismissal and remand for a determination whether genuine issues of material fact exist in respect of the standards of RLUIPA, and for such proceedings as may be necessary to resolve those issues.
In reviewing summary judgment orders, we apply the same standards that govern the trial courts. Prudential Property & Casualty Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). In determining whether a genuine issue of material fact exists, the matter must be viewed in the factual light most favorable to the non-moving party. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
Throughout the pendency of this matter, plaintiff has been an inmate in one or another of the Department's correctional facilities. On July 12, 2003, plaintiff became a member of the Nation of Gods and *1141 Earths, known variously as "the Nation," the "Five Percent Nation," or the "Five Percenters." This group is perceived by DOC officials to be a security threat, and plaintiff has been disciplined administratively for possessing the group's materials.
Plaintiff purports to be a sincere believer in the Nation's teachings. Since becoming a member, plaintiff has considered himself "resurrected from a life of total unrighteousness." Plaintiff asserts: "[a]lthough the Nation is technic[ ]ally a religion, all members refrain from using that term in describing the Nation because the term "religion" generally connotes belief in a mystery God which the Nation's doctrine specifically rejects."
As a member, plaintiff is "required and compelled to practice certain activities," including:
(a) teaching others about the knowledge of who God is, (b) study the Supreme Mathematics, Supreme Alphabets, 120 Degrees, Universal Flag, monthly National Statements, and newspaper periodicals, (c) observe holy days, which include the anniversaries of the birth and death of our founder, Clarence 13X Smith, also known as Father Allah, and the birthdays of Elijah Muhammad and Fard Muhammad, (d) conduct Civilization Classes, in which senior members educate newer members about the lessons and how they can be applied, and (e) gather monthly for "Parliaments" and "Rallies", during which members make collective decisions and help one another learn their lessons.
According to plaintiff, the recited activities are "compelled by, and central to, the Nation's system of religious beliefs."
Plaintiff asserts that, as a result of the Nation having been designated by the Department as a security threat group (STG) on March 4, 1998, "it is a serious prison infraction for plaintiff to participate in Nation activities or to exhibit anything related to the Nation, including lessons, literature, and periodicals"; or for him to attempt to engage in such activities.
Also according to plaintiff, if an inmate is found to be a member of the Nation, the inmate can be assigned to the Security Threat Group Management Unit (STGMU). In STGMU, an inmate loses reduced custody status and remains in maximum custody until successfully completing "a three-phase behavior modification and education program."
To complete that program, a Nation member "must sign a form renouncing affiliation" with the Nation. Plaintiff asserts that these policies "totally prevent [him] from exercising his religious beliefs, and impose[ ] a substantial burden on [his] religious exercise."
Plaintiff further alleges that "inmates of other religions[,] such as Muslims[,] are a greater [STG], not only because they commit a greater number of infractions than members of the Nation, but because the infractions they commit are more serious in nature." Moreover, he asserts "[t]he Nation does not advocate violence or disruptive behavior but encourages all members to be law abiding. Members of the Nation who violate prison rules are, therefore, also violating Nation principles."
In support of its summary judgment motion, the Department submitted several certifications. Among these was one from Roland Holvey, a Principal Investigator within the Department's Intelligence Section, Special Investigation Division. Holvey's duties included "monitoring [ ] gangs or [STGs] within [DOC,] identif[ying] inmates as members of gangs or [STGs,]" and referring the names of those inmates to the committee that decides whether to place those inmates in the STGMU. Holvey was a member of national *1142 and regional law enforcement organizations that performed similar work in identifying and investigating gangs and STGs. He had conducted extensive research investigation into the various STGs designated by the Department, including the Nation. Between 1994 and 1997, Holvey collected data on incidents involving members of the Nation, which Holvey compiled in a December 1997 report that was used to support the Department's designation of the Nation an STG. In making his assessment of the Nation as an STG, Holvey considered the following events:
(a) In August 1990, at the New Jersey State Prison, seven inmates were charged with attempted murder of staff after a planned attack. A captain was stabbed seven times and two corrections officers were severely beaten. One of the inmates charged and convicted of aggravated assault was a [Nation] member. . . .
(b) In May 1993[,] at East Jersey State Prison, an anonymous letter was received threatening the lives of custody staff. . . . An investigation revealed that the threat came from an unidentified [Nation] member. . . . It was learned that there were approximately forty members in the gang in the prison and that they planned to meet en-masse to celebrate the anniversary of the death of their founder, Clarence Smith.
(c) In December 1993[,] at Northern State Prison, a group of thirty to thirty-five inmates participated in a group demonstration in the gymnasium during afternoon recreation. The group gathered in a large circle and dispersed only after ordered to do so by custody staff. . . . [S]ubsequent investigation revealed that the group was planning to assault staff because the prison administration refused to recognize the Five Percenters as a legitimate inmate organization/religion.
(d) In November 1994[,] in Lakewood . . . and Asbury Park . . ., twelve Five Percent Nation members were arrested by police and received drug charges after a year-long investigation.
(e) In March 1995[,] at Southern State Correctional Facility, two inmates identified as Five Percent Nation members were involved in a physical altercation in a housing unit. Later that evening[,] both inmates fought again and additional inmates became involved. A homemade weapon was recovered in the housing unit bathroom. Three identified inmates received disciplinary charges.
(f) In May 1996[,] at Mountainview Youth Correctional Facility, a large group of NETA [another security threat group] and Five Percent Nation members conducted an unauthorized meeting during evening recreation.
(g) In August 1996[,] at New Jersey State Prison, a major disturbance occurred during evening recreation between members of the Five Percenters and the Sunni Muslims. The Special Operation Group was activated to maintain order within the facility.
(h) In November 1996[,] at the Albert G. Wagner Youth Correctional Facility, three incidents involving members of the Latin Kings [another security threat group], NETA, and the Five Percent Nation gangs occurred in one day. A total of twenty-four inmates total were involved in the three separate incidents which were determined [to relate] to the dispute between black and Hispanic inmates.
(i) In February 1997[,] at East Jersey State Prison, a [Nation] member was involved in a fight with another inmate in the big yard. After this fight, numerous Sunni Muslims became involved in a larger altercation with one of the combatants. *1143 Five inmates received disciplinary charges.
(j) In February 1997[,] at Riverfront State Prison, a corrections officer was attacked and seriously injured by a [Nation] member. . . . The assault occurred in a gymnasium. Subsequently, four other Five Percenters barricaded themselves in the gymnasium, where they set fires and damaged site property. The injured corrections officer was stabbed with a homemade knife and narrowly escaped death due to a punctured lung.
(k) In March 1997[,] at Riverfront State Prison, information was received which indicated that members of the Five Percent Nation gang had contracted with NETA gang members to assault staff members.
(l) In July 1997[,] at Middlesex County jail, [Nation] members participated in a hunger strike. Tensions between Five Percenters and NETA gang members were high due to a homicide in South Brunswick. County officers were required to use smoke and concussion grenades to enter two barricaded housing units.
Also according to Holvey, since 1994, almost 2,000 New Jersey inmates have been identified as Nation members. Most of them had been incarcerated for drug-related offenses, and much of their "activity while they are incarcerated" was related to drug sales and distribution. Holvey added: "There is also a propensity for violence committed by Five Percenters throughout the prison system." Holvey stated that the corrections departments in California, Maryland, North Carolina, South Carolina, Connecticut, and Wisconsin had designated the Nation as an STG. Holvey further reported that since the opening of the STGMU on March 4, 1998, the Department had experienced a 66% decrease in assaults on staff and a 73% decrease in organized violent behavior statewide.
He noted, as well, that April 1995 and November 1995 editions of the Nation's monthly newspaper contained headlines stating: "We are not a religion."
James F. Barbo, Director of the Department's Division of Operations, certified that he had examined the Department's records and determined that plaintiff had never been assigned to the STGMU. Barbo supplied a copy of the Inmate Handbook that each inmate would receive upon assignment to the STGMU. The handbook states: "Your success in any portion of the program described herein is achieved through desire and attitude." It continues: "If you demonstrate a desire to renounce your [STG] affiliation and activities, you will be afforded an opportunity to participate in the [STGMU's] Phase Program, which allows you to participate in a series of programming focusing on behavior alternatives." The handbook explains that there are three phases of the STGMU program, and that upon successful completion of the third, inmates are required to complete a "Renunciation Letter" in order to allow for "reintegration" into the general prison population.
Pursuant to the Department's February 27, 1998 policy statement for managing members of STGs, "Security Threat Group Activities" are defined as
activities or actions of an inmate which relate either directly or indirectly to goals of [an STG]. These activities include but are not limited to: Possession of [STG] literature such as, lessons, membership lists, manuals and artwork; Possession of [STG] paraphernalia such as, beads, artwork, medallions and clothing articles; Observation by staff of known [STG] hand-signs and/or signals; Participation in [STG] related assaults, disturbances, meetings, gatherings, incidents *1144 and events; Sending or receiving [STG] related correspondence; Recruiting of other inmates to join [an STG].
The policy document further states that there is a "Zero Tolerance" level for STG activity within the Department's correctional facilities. Accordingly, "[a]ny signs of [STG] activity shall be immediately dealt with, using the inmate disciplinary process. Disciplinary action shall result in every instance of an inmate's involvement in an activity related to [an STG]." A March 4, 1998 notice to the inmate population listed the STG designations, including that of the Nation, and set forth the prohibition on STG activities.
Under the Department's regulations on inmate discipline, N.J.A.C. 10A:4-4.1, "[a]sterisk offenses" are prohibited acts considered to be the most serious violations, resulting in the most severe sanctions. N.J.A.C. 10A:4-4.1 lists offense "*. 010" as "participating in an activity(ies) related to [an STG]" and lists offense "*. 011" as "possession or exhibition of anything related to [an STG]."
The record on appeal discloses that, on August 1, 2002, plaintiff was issued a disciplinary report citing him for offense *.011, stating that he "possessed [STG] `Five Percenters' materials within his property." Plaintiff reportedly told the investigating officer that the FBI had sent him the papers in question, and that he needed the materials for use on another inmate's court appeal, in which plaintiff was serving as a paralegal. For this infraction, plaintiff was sanctioned with ten days of detention, sixty days loss of commutation time, and confiscation of the STG material.
Plaintiff contends the trial court erred in evaluating his complaint as embodying a First Amendment issue, instead of applying the RLUIPA, which was the only claim specifically pled. He asserts that the standard to be applied for an RLUIPA claim is a "compelling interest/least restrictive means" analysis, instead of the "rationally related/legitimate interest" test used for First Amendment claims raised by prison inmates.
We reject defendants' suggestion that, because plaintiff was never removed from the general prison population or confined in the STGMU, he may lack standing to propound the challenge this action entails. Plaintiff suffered consequences  such as detention, loss of commutation time, and confiscation of items  under the policy he challenges. Those consequences are sufficient to meet basic standing requirements. See Jackson v. Department of Corrections, 335 N.J.Super. 227, 230-32, 762 A.2d 255 (App.Div.2000).
Moreover, plaintiff's interest in the Department's policy goes beyond the disciplinary action already taken against him. The "Zero Tolerance" policy set forth in the Department's materials, and published to the inmates, puts an admitted Nation member like plaintiff in peril of assignment to the STGMU at any time that he participates in the activities that plaintiff asserts are central to his religious beliefs.
We regard, as sound, the argument plaintiff advances that his challenge required the trial court to consider and apply the standards embodied in RLUIPA. That statute protects prisoners' rights to exercise their religion, providing as follows:
No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person 
(1) is in furtherance of a compelling governmental interest; and

*1145 (2) is the least restrictive means of furthering that compelling governmental interest.
[42 U.S.C.A. § 2000cc-1.]
The statute further specifies that its provisions "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this Act and the Constitution." 42 U.S.C.A. § 2000cc-3(g).
In Cutter v. Wilkinson, 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), the Supreme Court upheld RLUIPA against a challenge that it was an unconstitutional violation of the First Amendment's Establishment Clause.
RLUIPA applies only to burdens on religious exercise that occur "in a program or activity that receives Federal financial assistance. . . ." 42 U.S.C.A. § 2000cc-1(b); however, the Court, in Cutter, observed that "[e]very State . . . accepts federal funding for its prisons." Cutter, supra, 544 U.S. at 716 n. 4, 125 S.Ct. at 2118 n. 4, 161 L.Ed.2d at 1030 n. 4.
House of Fire Christian Church v. Zoning Board of Adjustment of Clifton, 379 N.J.Super. 526, 545, 879 A.2d 1212 (App. Div.2005), is the only reported New Jersey State court case under RLUIPA to date. It involved a land use matter, not a challenge from an inmate. In that opinion, we discussed the burdens of persuasion under RLUIPA, reciting the essence of 42 U.S.C.A. § 2000cc-2(b) as follows:
If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause [of the First Amendment to the United States Constitution] or a violation of [RLUIPA], the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice challenged by the claim substantially burdens the plaintiff's exercise of religion.
[House of Fire, supra, 379 N.J.Super. at 545, 879 A.2d 1212.]
We explained:
Thus, to prevail on a RLUIPA claim, the plaintiff has the initial burden of demonstrating that the . . . regulation "actually imposes a `substantial burden' on religious exercise." Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 760 (7th Cir.2003), cert. denied, 541 U.S. 1096, 124 S.Ct. 2816, 159 L.Ed.2d 262 (2004). If the plaintiff makes such a showing, then the burden shifts to the . . . government to demonstrate that the challenged regulation "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.A. § 2000cc(a)(1)(A)-(B).
[Ibid.]
We noted that the term "`religious exercise' is broadly defined by RLUIPA to include `any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" Id. at 546, 879 A.2d 1212 (quoting 42 U.S.C.A. § 2000cc-5(7)(A)).
The term "substantial burden" is not defined by RLUIPA; rather, its proponents intended that the term "be interpreted by reference to Supreme Court jurisprudence," and that it "not . . . be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden o[n] religious exercise." [146 Cong. Rec. S7774-01 at S7776 (July 27, 2000) (joint statement of Sens. Hatch and Kennedy)]. In Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214 (11th Cir.2004), cert. denied, [543] U.S. [1146], 125 S.Ct. 1295, 161 L.Ed.2d 106 (2005), the court explained *1146 that the Supreme Court's "articulation of what constitutes a `substantial burden' has varied over time." Id. at 1226 (citations omitted). After reviewing a number of federal cases, the Eleventh Circuit concluded:
[A] "substantial burden" must place more than an inconvenience on religious exercise; a "substantial burden" is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct.
[Id. at 1227.]
[House of Fire, supra, 379 N.J.Super. at 546-47, 879 A.2d 1212.]
Allah v. Department of Corrections, 326 N.J.Super. 543, 546-49, 742 A.2d 162 (App. Div.1999), although not involving RLUIPA because the case antedated the statute, addressed and affirmed the Department's policy of assigning a Nation member to the STGMU. There, we addressed constitutional claims according to the standard whether the restriction was "reasonably related to legitimate penological interests." Similarly, in In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464 (4th Cir.), cert. denied, 528 U.S. 874, 120 S.Ct. 179, 145 L.Ed.2d 151 (1999), also decided prior to RLUIPA's enactment, the court upheld, against constitutional challenges, the South Carolina prison system's classification of the Nation as a security threat group, along with provisions for multi-year administrative confinement in a program similar to New Jersey's STGMU program.
Although our State courts have not addressed RLUIPA in any reported cases involving prison inmates' claims, Marria v. Broaddus, 200 F.Supp.2d 280, 282 (S.D.N.Y.2002), furnishes guidance. There, an inmate plaintiff, who was a member of the Nation, raised both constitutional claims and RLUIPA claims challenging the New York State prison system's absolute ban on both the Nation's literature and the assembly of its members. Even under the "rationally related" test for First Amendment analysis, the court found there were fact questions as to whether accommodating the plaintiff's requests would result in a rise in gang violence, and whether any alternatives to the absolute bans on literature and assembly could be implemented without undermining the prison system's need to prevent recruitment of inmates for criminal activities. Id. at 296-97. The same questions precluded summary judgment under RLUIPA's more stringent test involving whether the absolute bans on literature and assembly represented the least restrictive means of furthering a compelling governmental interest. Id. at 298-99.
Some other federal cases, not involving the Nation, furnish further insight into how RLUIPA cases have been handled at the summary judgment stage. In Williams v. Bitner, 359 F.Supp.2d 370 (D.Pa.2005), aff'd on other grounds, 455 F.3d 186 (3d Cir.2006), the court denied summary judgment on the inmate plaintiff's RLUIPA claim that his religious beliefs as a Muslim were substantially burdened when prison officials required him to work as a cook in the prison cafeteria, preparing pork. On the premise that the inmate was advancing sincere beliefs, the court determined that "[t]he issuance of a misconduct and sanction of cell restriction could constitute a `substantial burden'" on the inmate's beliefs, where those punitive measures were threatened, and later imposed by prison officials to induce the inmate to assist in the preparation of pork. Id. at 376. The misconduct "carried with *1147 it an increase in Williams's security classification, precluding him from certain benefits, and [a] cell restriction limited his freedom of movement for several weeks, forcing him to miss a religious ceremony." Ibid. Accordingly, the inmate "was placed in the unenviable position of choosing between punishment by prison officials or observance of religious teachings. This is the type of choice that the RLUIPA was enacted to prevent." Ibid.
The court in Williams further considered, but rejected, the assertion that the prison officials' actions were the "least restrictive means" of furthering a "compelling" interest. Ibid. The court explained:
Maintaining institutional order and security is certainly a compelling interest. But the actions taken here did not further that interest. Williams was apparently not acting improperly or being disruptive on March 3, 2005. He was completing the tasks to which he had been assigned in the kitchen. He objected only when officials directed him to assist in activities that violated his sincere religious beliefs, and these protests were limited to a simple refusal and explanation, without threat or show of disrespect. No disturbance was seemingly caused by Williams's actions, and issuance of a misconduct was not necessary to ensure inmate discipline.
[Ibid. (citations omitted).]
The court noted conflicting evidence in the summary judgment record and, thus, an issue that remained open for trial, regarding whether a failure to publicly discipline Williams because witnesses were present arguably could have threatened institutional security. Ibid.
The Eighth Circuit has reversed a summary judgment dismissal of a RLUIPA claim. See Murphy v. Missouri Department of Corrections, 372 F.3d 979 (8th Cir.), cert. denied, 543 U.S. 991, 125 S.Ct. 501, 160 L.Ed.2d 378 (2004). The plaintiff inmate, Murphy, was a "practicing member of the Christian Separatist Church Society (CSC), a religious group that holds as a central tenet the belief that its members must all be Caucasian because they are uniquely blessed by God and must separate themselves from all non-Caucasian persons." Id. at 981. Murphy sought formal recognition and group worship accommodation for CSC. Ibid. Prison officials denied CSC group worship rights, asserting the need "to preserve security and to reduce the likelihood of racial violence"; the officials contended that racial violence "can be easily fueled by racial separation and inflammatory rhetoric." Id. at 982. Murphy raised four constitutional claims, and "an independent statutory claim under RLUIPA . . ., which is subject to review under a different standard." Id. at 983.
On Murphy's RLUIPA claim, the court concluded that the district court "improperly concluded on summary judgment that Murphy's religion was not substantially burdened and that `group worship and group discussion and study, cannot be said to be tenets or beliefs central to his religion.'" Id. at 988. The court held that "a substantial burden to free exercise rights may exist when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own." Ibid. (internal quotation and citation omitted). Murphy had asserted that numerous beliefs and aspects of his faith were incompatible with Protestant Christian beliefs, and that communal worship was an important part of his religion. Ibid. Accordingly, "[w]hether Murphy can establish the truth of these allegations and the existence of a substantial burden on the exercise of his religion is a matter to be determined by the district court in the first instance *1148 following a trial on the merits on this issue." Ibid.
The Eighth Circuit court added that, even if the inmate could show that his religious practice had been substantially burdened, the defendant correctional department "can still prevail if it establishes that its choice to give Murphy only solitary practitioner status was the least restrictive means to further a compelling interest." Ibid. Although the court found that the defendant's actions were justified under the Turner reasonableness analysis, there was "insufficient evidence to conclude that [they] have satisfied the heavier burden imposed upon them under RLUIPA." Ibid.
The court acknowledged that prison authorities have "a compelling interest in institutional security," but added that they "must do more than merely assert a security concern" and "must do more than offer conclusory statements and post hoc rationalizations for their conduct." Id. at 988-89. To satisfy RLUIPA's higher standard of review, prison authorities "must provide some basis for their concern that racial violence will result from any accommodation of CSC's request." Id. at 989. The court would not "require evidence that racial violence has in fact occurred in the form of a riot, but we do require some evidence that the MDOC [Missouri Department of Corrections] decision was the least restrictive means necessary to preserve its security interest." Ibid. The court explained:
there exists a question of fact as to whether there are means available to MDOC less restrictive than the total preclusion of group worship for CSC members. It is not clear that MDOC seriously considered any other alternatives, nor were any explored before the district court. The only evidence MDOC submitted to support its claim of security concern was testimony suggesting that Murphy is a racist and that his religion requires that only Anglo-Saxon individuals may participate. We cannot conclude from this limited evidence that MDOC has met its burden of establishing that its limitation on Murphy's religious practices constituted the least restrictive means necessary to ensure the prevention of racial violence within the prison. Accordingly, we remand for further fact finding on this issue.
[Ibid.]
The Seventh Circuit's decision in Borzych v. Frank, 439 F.3d 388, 390-91 (7th Cir.2006), provides a contrast in result, but not approach. There, summary judgment in favor of the defendant prison officials was affirmed. The inmate, Borzych, contended that prison officials in Wisconsin had violated the Constitution and RLUIPA by refusing to allow him to possess the books Creed of Iron, Temple of Wotan, and The NPKA Book of Blotar, which he said were necessary to practice his religion. Id. at 390. He identified his religion as Odinism (or Odinic Rite), which like Asatru and Wotanism, entailed the worship of Norse gods. Ibid. Borzych maintained that the books were religious texts, but Wisconsin's prison officials considered them to be non-religious texts promoting white-supremacist violence. Ibid.
The defendants conceded that Odinism was a religion, and the district court assumed that denying Borzych these books substantially burdened that religion's exercise. Ibid. The district court concluded, however, that the defendants' interest in preserving security in the prison system was compelling because those particular books advocated violence. Ibid. The court determined that banning the books was the least restrictive means to advance that interest, which meant that Borzych could not prevail under RLUIPA. Ibid.
*1149 The Court of Appeals agreed with the district court, stating:
We doubt that keeping these books out of the prison substantially burdens anyone's religious exercise. Borzych's only evidence on this point is his unreasoned say-so, plus equivalent declarations by other inmates. This is insufficient to create a material dispute that would require a trial. No objective evidence supports his assertion that the books are important to Odinism.
[Ibid. (citations omitted).]
The Court of Appeals held, further, that the record "establishe[d] that the prison system's ban is the least restrictive means to promote a compelling state interest in safety." Ibid. Borzych had not seriously disputed that the books advocated violence, and "[a]n interest in curtailing violence within prison walls is compelling." Id. at 390-91. Noting the defendants' principal argument that the books promoted violence to exalt the status of whites and demean other races, the court concluded that "it is the means rather than the underlying racist view that the defendants contend (and we hold) may be forbidden in prisoners' reading matter." Id. at 391.
In the light of the foregoing approaches, we hold that the trial court in the instant matter erred by limiting its analysis to Turner First Amendment standards when called upon to rule on plaintiff's RLUIPA claim. It is well established that the standards governing the two types of claims are different. Plaintiff was entitled to a summary judgment evaluation by the separate standards of RLUIPA.
In remanding, we hold no further than to require such an analysis, i.e., whether a genuine issue of material fact has been presented in respect of RLUIPA requirements. The Department's rules and actions must be governed by the test that requires it to have used the least restrictive means necessary to meet a compelling governmental interest. We do not reject the Department's argument that prison security is a compelling State interest. We leave to the trial court, in the first instance, an evaluation of that assertion in the face of the statutory requirement that the restrictions at issue must be considered the "least restrictive means" for achieving a compelling governmental interest, as well as the determination whether the issues may be decided on summary judgment or require further proceedings. See, e.g., Marria v. Broaddus, 200 F.Supp.2d 280 (S.D.N.Y.2002), and, for such guidance as it may furnish, the unpublished decision in that matter following trial, Marria v. Broaddus, 2003 WL 21782633, 2003 U.S. Dist. Lexis 13329 (S.D.N.Y.2003).
Reversed and remanded.
NOTES
[1] The action, as originally filed, named the former Commissioner of the Department of Corrections. Pursuant to Rule 4:34-4, the current Commissioner has been substituted.
[2] Apparently, in an earlier motion for summary judgment, the trial court had dismissed plaintiff's claims for compensatory damages.